# MANSELL v. MANSELL

No. 87–201.   Argued January 10, 1989—Decided May 30, 1989

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BRENNAN, WHITE, STEVENS, SCALIA, and KENNEDY, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post*, p. 595.

*Douglas B. Cone* argued the cause for appellant. With him on the briefs was *Jim T. Elia.*

*Dennis A. Cornell* argued the cause and filed a brief for appellee.*

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Assistant Attorney General Bolton,* and *Deputy Solicitor General Merrill;* and for the Retired Officers Association et al. by *Jan Horbaly.*

*June Kazuko Inuzuka, Judith I. Avner,* and *Sally F. Goldfarb* filed a brief for the Women's Equity Action League et al. as *amici curiae* urging affirmance.

JUSTICE MARSHALL delivered the opinion of the Court.

In this appeal, we decide whether state courts, consistent with the federal Uniformed Services Former Spouses' Protection Act, 10 U. S. C. § 1408 (1982 ed. and Supp. V) (Former Spouses' Protection Act or Act), may treat as property divisible upon divorce military retirement pay waived by the retiree in order to receive veterans' disability benefits. We hold that they may not.

## I

### A

Members of the Armed Forces who serve for a specified period, generally at least 20 years, may retire with retired pay. 10 U. S. C. § 3911 et seq. (1982 ed. and Supp. V) (Army); § 6321 et seq. (1982 ed. and Supp. V) (Navy and Marine Corps); § 8911 et seq. (1982 ed. and Supp. V) (Air Force). The amount of retirement pay a veteran is eligible to receive is calculated according to the number of years served and the rank achieved. §§ 3926 and 3991 (Army); §§ 6325–6327 (Navy and Marine Corps); § 8929 (Air Force). Veterans who became disabled as a result of military service are eligible for disability benefits. 38 U. S. C. § 310 (wartime disability); § 331 (peacetime disability). The amount of disability benefits a veteran is eligible to receive is calculated according to the seriousness of the disability and the degree to which the veteran's ability to earn a living has been impaired. §§ 314 and 355.

In order to prevent double dipping, a military retiree may receive disability benefits only to the extent that he waives a corresponding amount of his military retirement pay. § 3105.[1] Because disability benefits are exempt from federal, state, and local taxation, § 3101(a), military retirees who waive their retirement pay in favor of disability benefits in-

---

[1] For example, if a military retiree is eligible for $1500 a month in retirement pay and $500 a month in disability benefits, he must waive $500 of retirement pay before he can receive any disability benefits.

crease their after-tax income. Not surprisingly, waivers of retirement pay are common.

California, like several other States, treats property acquired during marriage as community property. When a couple divorces, a state court divides community property equally between the spouses while each spouse retains full ownership of any separate property. See Cal. Civ. Code Ann. § 4800(a) (West 1983 and Supp. 1989). California treats military retirement payments as community property to the extent they derive from military service performed during the marriage. See, e. g., Casas v. Thompson, 42 Cal. 3d 131, 139, 720 P. 2d 921, 925, cert. denied, 479 U. S. 1012 (1986).

In McCarty v. McCarty, 453 U. S. 210 (1981), we held that the federal statutes then governing military retirement pay prevented state courts from treating military retirement pay as community property. We concluded that treating such pay as community property would do clear damage to important military personnel objectives. Id., at 232–235. We reasoned that Congress intended that military retirement pay reach the veteran and no one else. Id., at 228. In reaching this conclusion, we relied particularly on Congress' refusal to pass legislation that would have allowed former spouses to garnish military retirement pay to satisfy property settlements. Id., at 228–232. Finally, noting the distressed plight of many former spouses of military members, we observed that Congress was free to change the statutory framework. Id., at 235–236.

In direct response to McCarty, Congress enacted the Former Spouses' Protection Act, which authorizes state courts to treat "disposable retired or retainer pay" as community property. 10 U. S. C. § 1408(c)(1).[2] "'Disposable retired or

---

[2] The language of the Act covers both community property and equitable distribution States, as does our decision today. Because this case concerns a community property State, for the sake of simplicity we refer to § 1408(c)(1) as authorizing state courts to treat "disposable retired or retainer pay" as community property.

retainer pay'" is defined as "the total monthly retired or retainer pay to which a military member is entitled," minus certain deductions. § 1408(a)(4) (1982 ed. and Supp. V). Among the amounts required to be deducted from total pay are any amounts waived in order to receive disability benefits. § 1408(a)(4)(B).[3]

The Act also creates a payments mechanism under which the Federal Government will make direct payments to a former spouse who presents, to the Secretary of the relevant military service, a state-court order granting her a portion of the military retiree's disposable retired or retainer pay. This direct payments mechanism is limited in two ways. § 1408(d). First, only a former spouse who was married to a military member "for a period of 10 years or more during which the member performed at least 10 years of service creditable in determining the member's eligibility for retired or retainer pay," § 1408(d)(2), is eligible to receive direct community property payments. Second, the Federal Government will not make community property payments that exceed 50 percent of disposable retired or retainer pay. § 1408(e)(1).

B

Appellant Gerald E. Mansell and appellee Gaye M. Mansell were married for 23 years and are the parents of six children. Their marriage ended in 1979 with a divorce decree from the Merced County, California, Superior Court. At that time, Major Mansell received both Air Force retirement pay and, pursuant to a waiver of a portion of that pay, disability benefits. Mrs. Mansell and Major Mansell entered

---

[3] Also deducted from total military retirement pay are amounts: (a) owed by the military member to the United States; (b) required by law to be deducted from total pay, including employment taxes, and fines and forfeitures ordered by courts-martial; (c) properly deducted for federal, state, and local income taxes; (d) withheld pursuant to other provisions under the Internal Revenue Code; (e) equal to the amount of retired pay of a member retired for physical disability; and (f) deducted to create an annuity for the former spouse. 10 U. S. C. §§ 1408(a)(4)(A)–(F) (1982 ed. and Supp. V).

into a property settlement which provided, in part, that Major Mansell would pay Mrs. Mansell 50 percent of his total military retirement pay, including that portion of retirement pay waived so that Major Mansell could receive disability benefits. Civ. No. 55594 (May 29, 1979). In 1983, Major Mansell asked the Superior Court to modify the divorce decree by removing the provision that required him to share his total retirement pay with Mrs. Mansell. The Superior Court denied Major Mansell's request without opinion.

Major Mansell appealed to the California Court of Appeal, Fifth Appellate District, arguing that both the Former Spouses' Protection Act and the anti-attachment clause that protects a veteran's receipt of disability benefits, 38 U. S. C. § 3101(a) (1982 ed. and Supp. IV),[4] precluded the Superior Court from treating military retirement pay that had been waived to receive disability benefits as community property. Relying on the decision of the Supreme Court of California in *Casas* v. *Thompson, supra,* the Court of Appeal rejected that portion of Major Mansell's argument based on the Former Spouses' Protection Act. 5 Civ. No. F002872 (Jan. 30, 1987).[5] *Casas* held that after the passage of the Former Spouses' Protection Act, federal law no longer pre-empted

---

[4] That clause provides that veterans' benefits "shall not be assignable except to the extent specifically authorized by law, and . . . shall be exempt from the claim[s] of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the [veteran]." 38 U. S. C. § 3101(a) (1982 ed. and Supp. V).

[5] In a supplemental brief, Mrs. Mansell argues that the doctrine of res judicata should have prevented this pre-*McCarty* property settlement from being reopened. *McCarty* v. *McCarty,* 453 U. S. 210 (1981). The California Court of Appeal, however, decided that it was appropriate, under California law, to reopen the settlement and reach the federal question. 5 Civ. No. F002872 (Jan. 30, 1987). Whether the doctrine of res judicata, as applied in California, should have barred the reopening of pre-*McCarty* settlements is a matter of state law over which we have no jurisdiction. The federal question is therefore properly before us.

state community property law as it applies to military retirement pay. The *Casas* court reasoned that the Act did not limit a state court's ability to treat total military retirement pay as community property and to enforce a former spouse's rights to such pay through remedies other than direct payments from the Federal Government. 42 Cal. 3d, at 143–151, 720 P. 2d, at 928–933. The Court of Appeal did not discuss the anti-attachment clause, 38 U. S. C. § 3101(a).[6] The Supreme Court of California denied Major Mansell's petition for review.

We noted probable jurisdiction, 487 U. S. 1217 (1988), and now reverse.

## II

Because domestic relations are preeminently matters of state law, we have consistently recognized that Congress, when it passes general legislation, rarely intends to displace state authority in this area. See, *e. g.*, *Rose* v. *Rose*, 481 U. S. 619, 628 (1987); *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979). Thus we have held that we will not find pre-emption absent evidence that it is "'positively required by direct enactment.'" *Hisquierdo*, *supra*, at 581 (quoting *Wetmore* v. *Markoe*, 196 U. S. 68, 77 (1904)). The instant case, however, presents one of those rare instances where Congress has directly and specifically legislated in the area of domestic relations.

It is clear from both the language of the Former Spouses' Protection Act, see, *e. g.*, § 1408(c)(1), and its legislative history, see, *e. g.*, H. R. Conf. Rep. No. 97–749, p. 165 (1982); S. Rep. No. 97–502, pp. 1–3, 16 (1982), that Congress sought to change the legal landscape created by the *McCarty* deci-

---

[6] Because we decide that the Former Spouses' Protection Act precludes States from treating as community property retirement pay waived to receive veterans' disability benefits, we need not decide whether the anti-attachment clause, § 3101(a), independently protects such pay. See, *e. g.*, *Rose* v. *Rose*, 481 U. S. 619 (1987); *Wissner* v. *Wissner*, 338 U. S. 655 (1950).

sion.[7]   Because pre-existing federal law, as construed by
this Court, completely pre-empted the application of state
community property law to military retirement pay, Con-
gress could overcome the *McCarty* decision only by enacting
an affirmative grant of authority giving the States the power
to treat military retirement pay as community property.   Cf.
*Midlantic Nat. Bank* v. *New Jersey Dept. of Environmental
Protection*, 474 U. S. 494, 501 (1986).

The appellant and appellee differ sharply on the scope of
Congress' modification of *McCarty*.   Mrs. Mansell views the
Former Spouses' Protection Act as a complete congressional
rejection of *McCarty*'s holding that state law is pre-empted;
she reads the Act as restoring to state courts all pre-*McCarty*
authority.   Major Mansell, supported by the United States,
argues that the Former Spouses' Protection Act is only a par-
tial rejection of the *McCarty* rule that federal law pre-empts
state law regarding military retirement pay.[8]

Where, as here, the question is one of statutory construc-
tion, we begin with the language of the statute.   See, *e. g.*,
*Blum* v. *Stenson*, 465 U. S. 886, 896 (1984); *Consumer Prod-
uct Safety Comm'n* v. *GTE Sylvania, Inc.*, 447 U. S. 102,
108 (1980).   Mrs. Mansell's argument faces a formidable ob-
stacle in the language of the Former Spouses' Protection Act.
Section 1408(c)(1) of the Act affirmatively grants state courts
the power to divide military retirement pay, yet its language
is both precise and limited.   It provides that "a court may
treat disposable retired or retainer pay . . . either as prop-
erty solely of the member or as property of the member and
his spouse in accordance with the law of the jurisdiction of

---

[7] Congress also demonstrated its focus on *McCarty* when it chose June
25, 1981, the day before *McCarty* was decided, as the applicable date for
some of the Act's provisions.   10 U. S. C. § 1408(c)(1); see also note follow-
ing § 1408, Pub. L. 97–252, § 1006(b) (transition provisions).

[8] Although the United States has filed an *amicus* brief supporting Major
Mansell, its initial *amicus* brief, filed before the Court noted jurisdiction,
supported Mrs. Mansell.

such court." § 1408(c)(1). The Act's definitional section specifically defines the term "disposable retired or retainer pay" to exclude, *inter alia*, military retirement pay waived in order to receive veterans' disability payments. § 1408(a)(4)(B).[9] Thus, under the Act's plain and precise language, state courts have been granted the authority to treat disposable retired pay as community property; they have not been granted the authority to treat total retired pay as community property.

Mrs. Mansell attempts to overcome the limiting language contained in the definition, § 1408(a)(4)(B), by reading the Act as a garnishment statute designed solely to set out the circumstances under which, pursuant to a court order, the Federal Government will make direct payments to a former spouse. According to this view, § 1408(a)(4)(B) defines "[d]isposable retired or retainer pay" only because payments under the federal direct payments mechanism are limited to amounts defined by that term.

The garnishment argument relies heavily on the Act's saving clause. That clause provides:

> "Nothing in this section shall be construed to relieve a member of liability for the payment of alimony, child support, *or other payments* required by a court order on the grounds that payments made out of disposable retired or retainer pay under this section have been made in the maximum amount permitted under [the direct payments mechanism]. Any such unsatisfied obligation

---

[9] The statute provides in pertinent part:

"'Disposable retired or retainer pay' means the total monthly retired or retainer pay to which a member is entitled . . . less amounts which—

. . .

"(B) are required by law to be and are deducted from the retired or retainer pay of such member, including fines and forfeitures ordered by courts-martial, Federal employment taxes, and amounts waived in order to receive compensation under title 5 or title 38 [disability payments]." § 1408(a)(4)(B).

of a member may be enforced by any means available under law other than the means provided under this section in any case in which the maximum amount permitted under . . . [the direct payments mechanism] has been paid." § 1408(e)(6) (emphasis added).

Mrs. Mansell argues that, because the saving clause expressly contemplates "other payments" in excess of those made under the direct payments mechanism, the Act does not "attempt to tell the state courts what they may or may not do with the underlying property." Brief for Appellee 17. For the reasons discussed below, we find a different interpretation more plausible. In our view, the saving clause serves the limited purpose of defeating any inference that the federal direct payments mechanism displaced the authority of state courts to divide and garnish property not covered by the mechanism. Cf. *Hisquierdo*, 439 U. S., at 584 (to prohibit garnishment is to prohibit division of property); *Wissner* v. *Wissner*, 338 U. S. 655 (1950) (same).

First, the most serious flaw in the garnishment argument is that it completely ignores § 1408(c)(1). Mrs. Mansell provides no explanation for the fact that the defined term—"disposable retired or retainer pay"—is used in § 1408(c)(1) to limit specifically and plainly the extent to which state courts may treat military retirement pay as community property.

Second, the view that the Act is solely a garnishment statute and therefore not intended to pre-empt the authority of state courts is contradicted not only by § 1408(c)(1), but also by the other subsections of § 1408(c). Sections 1408(c)(2), (c)(3), and (c)(4) impose new substantive limits on state courts' power to divide military retirement pay. Section 1408(c)(2) prevents a former spouse from transferring, selling, or otherwise disposing of her community interest in the military retirement pay.[10] Section 1408(c)(3) provides that a

---

[10] The Senate Report expressly contemplates that § 1408(c)(2) will pre-empt state law. S. Rep. No. 97–502, p. 16 (1982).

state court cannot order a military member to retire so that the former spouse can immediately begin receiving her portion of military retirement pay.[11] And § 1408(c)(4) prevents spouses from forum shopping for a State with favorable divorce laws.[12] Because each of these provisions pre-empts state law, the argument that the Act has no pre-emptive effect of its own must fail.[13] Significantly, Congress placed

[11] There was some concern expressed at the Senate hearings on the Act that state courts could direct a military member to retire. See, *e. g.*, Hearings before the Subcommittee on Manpower and Personnel of the Senate Committee on Armed Services, 97th Cong., 2d Sess., 132–133 (1982) (Sen. Exon); *id.*, at 70–71 (veterans' group); *id.*, at 184 (Air Force). Thus the Senate version of the bill contained § 1408(c)(3) in order to ensure that state courts did not have such power, S. Rep. No. 97–502, *supra*, at 17, and at conference the House agreed to add the provision. H. R. Conf. Rep. No. 97–749, p. 167 (1982).

[12] A state court may not treat disposable retirement pay as community property unless it has jurisdiction over the military member by reason of (1) residence, other than by military assignment in the territorial jurisdiction of the court, (2) domicile, or (3) consent. § 1408(c)(4). Although the Senate Committee had decided not to include any forum shopping restrictions, seeing "no need to limit the jurisdiction of the State courts by restricting the benefits afforded by this bill . . . ," S. Rep. No. 97–502, *supra*, at 9, the House version of the bill contained the restrictions, and at conference, the Senate agreed to add them. H. R. Conf. Rep. No. 97–749, *supra*, at 167.

[13] That Congress intended the substantive limits in § 1408(c)(1) to be, to some extent, distinct from the limits on the direct payments mechanism contained in § 1408(d) is demonstrated by the legislative compromise that resulted in the direct payments mechanism being available only to former spouses who had been married to the military retiree for 10 years or more. § 1408(d)(2). Under the House version of the bill, military retirement pay could be treated as community property only if the couple had been married for 10 years or more. H. R. Conf. Rep. No. 97–749, *supra*, at 165. The Senate Committee had considered, but rejected, such a provision. S. Rep. No. 97–502, *supra*, at 9–11. The conferees agreed to remove the House restriction. Instead, they limited the federal direct payments mechanism to marriages that had lasted 10 years or more. H. R. Conf. Rep. No. 97–749, *supra*, at 166–167. Under this compromise, state courts have been granted the authority to award a portion of disposable military retired pay to former spouses who were married to the mili-

each of these substantive restrictions on state courts in the same section of the Act as § 1408(c)(1). We think it unlikely that every subsection of § 1408(c), except § 1408(c)(1), was intended to pre-empt state law.

In the face of such plain and precise statutory language, Mrs. Mansell faces a daunting standard. She cannot prevail without clear evidence that reading the language literally would thwart the obvious purposes of the Act. See, *e. g.*, *Trans Alaska Pipeline Rate Cases*, 436 U. S. 631, 643 (1978). The legislative history does not indicate the reason for Congress' decision to shelter from community property law that portion of military retirement pay waived to receive veterans' disability payments.[14] But the absence of legislative history on this decision is immaterial in light of the plain and precise language of the statute; Congress is not required to build a record in the legislative history to defend its policy choices.

Because of the absence of evidence of specific intent in the legislative history, Mrs. Mansell resorts to arguments about the broad purposes of the Act. But this reliance is misplaced because, at this general level, there are statements that both contradict and support her arguments. Her argument that the Act contemplates no federal pre-emption is supported by statements in the Senate Report and the House Conference

---

tary member for less than 10 years, but such former spouses may not take advantage of the direct payments mechanism.

[14] The only reference to the definitional section is contained in the Senate Report which states that the deductions from total retired pay, including retirement pay waived in favor of veterans' disability payments, "generally parallel those existing deductions which may be made from the pay of Federal employees and military personnel before such pay is subject to garnishment for alimony or child support payments under section 459 of the Social Security Act. (42 U. S. C. 659)." S. Rep. No. 97–502, *supra*, at 14. This statement, however, describes the defined term in § 1408(a)(4). It is not helpful in determining why Congress chose to use the defined term—"disposable retired or retainer pay"—to limit state-court authority in § 1408(c)(1).

Report that the purpose of the Act is to overcome the *McCarty* decision and to restore power to the States.[15] But the Senate Report and the House Conference Report also contain statements indicating that Congress rejected the uncomplicated option of removing all federal pre-emption and returning unlimited authority to the States.[16] Indeed, a bill that would have eliminated all federal pre-emption died in the Senate Committee.[17] Her argument that Congress primarily intended to protect former spouses is supported by evidence that Members of Congress were moved by, and responding to, the distressed economic plight of military wives after a divorce.[18] But the Senate Report and the House debates con-

[15] See, *e. g.*, S. Rep. No. 97–502, *supra*, at 1 ("The primary purpose of the bill is to remove the effect of the United States Supreme Court decision in *McCarty* v. *McCarty*, 453 U. S. 210 (1981). The bill would accomplish this objective by permitting Federal, State, and certain other courts, consistent with the appropriate laws, to once again consider military retired pay when fixing the property rights between the parties to a divorce, dissolution, annulment or legal separation"). See also *id.*, at 5 and 16; H. R. Conf. Rep. No. 97–749, *supra*, at 165.

[16] H. R. Conf. Rep. No. 97–749, *supra*, at 165 ("The House amendment would permit disposable military retired pay to be considered as property in divorce settlements *under certain specified conditions*") (emphasis added); *ibid.* ("The House Amendment contained several provisions that would place restrictions on the division of retired pay"); S. Rep. No. 97–502, *supra*, at 4 ("[Senate] 1814 imposes *three distinct limits* on the division or enforcement of court orders against military retired pay in divorce cases") (emphasis added).

[17] Entitled "Nonpreemption of State law" the bill provided that "[f]or purposes of division of marital property of any member or former member of the armed forces upon dissolution of such member's marriage, the law of the State in which the dissolution of marriage proceeding was instituted shall be dispositive on all matters pertaining to the division of any retired, retirement, or retainer pay to which such member or former member is entitled or will become entitled." S. 1453, 97th Cong., 1st Sess. (1981).

[18] The Senate Committee pointed out that "frequent change-of-station moves and the special pressures placed on the military spouse as a homemaker make it extremely difficult to pursue a career affording economic security, job skills and pension protection." S. Rep. No. 97–502, *supra*, at 6. The language of the Act, and much of its legislative history, is written

tain statements which reveal that Congress was concerned as well with protecting the interests of military members.[19]

Thus, the legislative history, read as a whole, indicates that Congress intended both to create new benefits for former spouses and to place limits on state courts designed to protect military retirees. Our task is to interpret the statute as best we can, not to second-guess the wisdom of the congressional policy choice. See, *e. g., Rodriguez* v. *United States*, 480 U. S. 522, 526 (1987) *(per curiam)* ("Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice"). Given Congress' mixed purposes, the legislative history does not clearly support Mrs. Mansell's view that giving effect to the plain and precise language of the statute would thwart the obvious purposes of the Act.

We realize that reading the statute literally may inflict economic harm on many former spouses. But we decline to misread the statute in order to reach a sympathetic result when such a reading requires us to do violence to the plain language of the statute and to ignore much of the legislative history. Congress chose the language that requires us to decide as we do, and Congress is free to change it.

## III

For the reasons stated above, we hold that the Former Spouses' Protection Act does not grant state courts the

---

in gender neutral terms, and there is no doubt that the Act applies equally to both former husbands and former wives. But "it is quite evident from the legislative history that Congress acted largely in response to the plight of the military *wife*." Horkovich, Uniformed Services Former Spouses' Protection Act: Congress' Answer to *McCarty* v. *McCarty* Goes Beyond the Fundamental Question, 23 Air Force L. Rev. 287, 308 (1982–1983) (emphasis in original).

[19] See, *e. g.,* S. Rep. No. 97–502, *supra,* at 7 ("All agreed that some form of remedial legislation which is fair and equitable to both spouses was necessary to provide a solution to the *McCarty* decision"); see also *id.,* at 11; nn. 10, 11, 12, and 16, *supra.*

power to treat as property divisible upon divorce military retirement pay that has been waived to receive veterans' disability benefits. The judgment of the California Court of Appeal is hereby reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN joins, dissenting.

Today the Court holds that the federal Uniformed Services Former Spouses' Protection Act (Former Spouses' Protection Act or Act) denies state courts the power to order in a divorce decree the division of military retirement pay unilaterally waived by a retiree in order to receive veterans' disability benefits. The harsh reality of this holding is that former spouses like Gaye Mansell can, without their consent, be denied a fair share of their ex-spouse's military retirement pay simply because he elects to increase his after-tax income by converting a portion of that pay into disability benefits. On the Court's reading of the Former Spouses' *Protection* Act, Gaye Mansell will lose nearly 30 percent of the monthly retirement income she would otherwise have received as community property. I view the Court's holding as inconsistent with both the language and the purposes of the Act, and I respectfully dissent.

The Court recognized in *McCarty* v. *McCarty*, 453 U. S. 210, 235 (1981), that "the plight of an ex-spouse of a retired service member is often a serious one." In holding that federal law precluded state courts from dividing *nondisability* military retired pay pursuant to state community property laws, *McCarty* concluded with an invitation to Congress to reexamine the issue. Congress promptly did so and enacted the Former Spouses' Protection Act. Today, despite overwhelming evidence that Congress intended to overrule *McCarty* completely, to alter pre-existing federal military retirement law so as to eliminate the pre-emptive effect

discovered in *McCarty*, and to restore to the States authority to issue divorce decrees affecting military retirement pay consistent with state law, the Court assumes that Congress only partially rejected *McCarty* and that the States can apply their community property laws to military retirement pay only to the extent that the Former Spouses' Protection Act affirmatively grants them authority to do so. *Ante*, at 588. The *McCarty* decision, however, did not address retirement pay waived to receive disability benefits; nor did it identify any explicit statutory provision precluding the States from characterizing such waived retirement pay as community property. Thus, I reject the Court's central premise that the States are precluded by *McCarty* from characterizing as community property any retirement pay waived to receive disability benefits absent an affirmative grant of authority in the Former Spouses' Protection Act.

In my view, Congress intended, by enacting the Former Spouses' Protection Act, to eliminate the effect of *McCarty*'s pre-emption holding altogether and to return to the States their authority "to treat military pensions in the same manner as they treat other retirement benefits." S. Rep. No. 97–502, p. 10 (1982). See also *id.*, at 1 ("The primary purpose of the bill is to remove the effect of the United States Supreme Court decision in *McCarty* v. *McCarty*, 453 U. S. 210 (1981). The bill would accomplish this objective by permitting Federal, State, and certain other courts, consistent with the appropriate laws, to once again consider military retired pay when fixing the property rights between the parties to a divorce, dissolution, annulment or legal separation"); *id.*, at 5 ("[T]he committee intends the legislation to restore the law to what it was when the courts were permitted to apply State divorce laws to military retired pay"); *id.*, at 16 ("The provision is intended to remove the federal preemption found to exist by the United States Supreme Court and permit State and other courts of competent jurisdiction to apply pertinent State or other laws in determining

whether military retired or retainer pay should be divis-[i]ble"); 128 Cong. Rec. 18314 (1982) ("The amendment simply returns to State courts the authority to treat military retired pay as it does other public and private pensions") (remarks of Rep. Schroeder, bill sponsor).

Family law is an area traditionally of state concern, *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 581 (1979), and we have not found federal pre-emption of state authority in this area absent a determination that "Congress has 'positively required by direct enactment' that state law be pre-empted." *Ibid.* (quoting *Wetmore* v. *Markoe*, 196 U. S. 68, 77 (1904)). The Former Spouses' Protection Act does not "positively require" States to abandon their own law concerning the divisibility upon divorce of military retirement pay waived in order to obtain veterans' disability benefits. On the contrary, the whole thrust of the Act was to restore to the States their traditional authority in the area of domestic relations. Even beyond that restoration, Congress sought to provide greater federal assistance and protection to military spouses than existed before *McCarty* by creating a federal garnishment remedy in aid of state court community property awards. That, in fact, is the central purpose and preoccupation of the Act's complex statutory framework. The Former Spouses' Protection Act is primarily a remedial statute creating a mechanism whereby former spouses armed with state court orders may enlist the Federal Government to assist them in obtaining some of their property entitlements upon divorce. The federal garnishment remedy created by the Act is limited, but it serves as assistance and not, as the Court would have it, a hindrance to former spouses. Thus, the provision at 10 U. S. C. § 1408(a)(4)(B) (1982 ed. and Supp. V) of the Act defining "[d]isposable retired or retainer pay" to exclude "amounts waived in order to receive compensation under title 5 or title 38," and its incorporation into § 1408(c)(1)'s community property provision, only limits the federal garnishment remedy created by the Act. It does not limit the authority

of States to characterize such waived retirement pay as community property under state law.

This reading is reinforced by the legislative history, which indicates that "[t]he specific deductions that are to be made from the total monthly retired and retainer pay generally parallel those existing deductions which may be made from the pay of Federal employees and military personnel before such pay is subject to *garnishment* for alimony or child support payments under section 459 of the Social Security Act (42 U. S. C. 659)." S. Rep. No. 97–502, *supra*, at 14 (emphasis added). The Court finds that this statement "is not helpful in determining why Congress chose to use the defined term—'disposable retired or retainer pay'—to limit state-court authority in § 1408(c)(1)." *Ante*, at 592, n. 14. True, it is singularly unhelpful in supporting the Court's view that § 1408(c)(1) denies state courts authority to *characterize* retirement pay waived in lieu of disability benefits as community property. By contrast, it *is* helpful in determining why Congress chose to use "disposable retired or retainer pay" as the term limiting state court authority to *garnish* military retirement pay. In light of the fact that disability benefits are exempt from garnishment in most cases, 38 U. S. C. § 3101(a) (1982 ed., Supp. V), had Congress not excluded "amounts waived" in order to receive veterans' disability benefits from the federal garnishment remedy created by the Former Spouses' Protection Act it would have eviscerated the force of the anti-attachment provisions of § 3101(a).

To take advantage of the federal garnishment remedy, which provides for direct payment by the Government to former spouses in specified circumstances, former spouses must serve on the appropriate service Secretary court orders meeting certain requirements. In the case of a division of property, the court order must "specifically provid[e] for the payment of an amount, expressed in dollars or as a percentage of disposable retired or retainer pay, from the disposable retired or retainer pay of a member." 10 U. S. C. § 1408(a)

(2)(C) (1982 ed., Supp. V). It must contain certain information and be regular on its face. §§ 1408(b)(1)(B), 1408(b)(1)(C), 1408(b)(1)(D), 1408(b)(2) (1982 ed. and Supp. V). The Act sets forth the procedures to be followed by the Secretary in making payments directly to former spouses. § 1408(d) (1982 ed. and Supp. V). Finally, the Act places limits on the total amount of disposable retirement pay that may be paid by the Secretary to former spouses, §§ 1408(e)(1), 1408(e)(4)(B) (1982 ed. and Supp. V), and it clarifies the procedures to be followed in the event of multiple or conflicting court orders. §§ 1408(e)(2), 1408(e)(3)(A) (1982 ed., Supp. V).

Subsection 1408(c)(1) authorizes the application of this federal garnishment remedy to community property awards by providing that "a court *may* treat disposable retired or retainer pay payable to a member . . . either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court." (Emphasis added.) This provision should not be read to *preclude* States from characterizing retirement pay waived to receive disability benefits as community property but only to preclude the use of the federal direct payments mechanism to attach that waived pay. Nor do §§ 1408 (c)(2), (c)(3), and (c)(4) compel the conclusion that Congress intended to preempt States from characterizing gross military retirement pay as community property divisible upon divorce. Those three provisions indicate what States may "not" do. That Congress explicitly restricted the authority of courts in certain specific respects, however, does not support the inference that § 1408(c)(1)—an affirmative *grant* of power—should be interpreted as precluding everything it does not grant. On the contrary, it supports the inference that Congress explicitly and directly precluded those matters it wished to preempt entirely, leaving the balance of responsibility in the area of domestic relations to the States. In this respect, the Court mischaracterizes Gaye Mansell's argument as insisting that "the Act contemplates no federal pre-emption. . . ."

*Ante,* at 592. Subsection 1408(c) has substantive effects on the power of state courts—its first paragraph expands those powers ("a court may treat"); its remaining paragraphs restrict those powers ("this section does not create"; "[t]his section does not authorize"; "[a] court may not treat").

That States remain free to characterize waived portions of retirement pay as community property is unambiguously underscored by the broad language of the saving clause contained in the Act, § 1408(e)(6). That clause provides:

> "*Nothing* in this section shall be construed to relieve a member of liability for the payment of alimony, child support, or *other payments* required by a court order on the grounds that payments made out of disposable retired or retainer pay under this section have been made in the maximum amount permitted under paragraph (1) or subparagraph (B) of paragraph (4). *Any such unsatisfied obligation of a member may be enforced by any means available under law other than the means provided under this section* in any case in which the maximum amount permitted under paragraph (1) has been paid and under section 459 of the Social Security Act (42 U. S. C. 659) in any case in which the maximum amount permitted under subparagraph (B) of paragraph (4) has been paid." (Emphasis added.)

The Court explains that the saving clause "serves the limited purpose of defeating any inference that the federal direct payments mechanism displaced the authority of state courts to divide and garnish property *not* covered by the mechanism." *Ante,* at 590 (emphasis added). I agree. What I do not understand is how the Court can read the Act's saving clause in this manner and yet conclude, without contradiction, that California may not characterize retirement pay waived for disability benefits as community property. All California seeks to do is "divide and garnish property not covered by the [federal direct payments] mechanism." *Ibid.* Specifically, California wishes to exercise its traditional fam-

ily law powers to divide as community property that portion of Major Mansell's retirement pay which he unilaterally converted into disability benefits, and use state-law garnishment remedies to attach the *value* of Gaye Mansell's portion of this community property. That is precisely what § 1408(e)(6) saves to the States by "defeating" any contrary inference, *ante*, at 590, that the Act has displaced the State's authority to enforce its divorce decrees "by any means available under law other than the means provided under this section. . . ." § 1408(e)(6). As the California Supreme Court so aptly put it, in the saving clause Congress emphasized that "the limitations on the service secretary's ability to reach the retiree's gross pay [are] not to be deemed a limitation on the state court's ability to define the community property interests at the time of dissolution." *Casas* v. *Thompson*, 42 Cal. 3d 131, 150, 720 P. 2d 921, 933, cert. denied, 479 U. S. 1012 (1986). In other words, while a former spouse may not receive community property payments that exceed 50 percent of a retiree's disposable retirement pay through the direct federal garnishment mechanism, § 1408(e)(1), a state court is free to characterize gross retirement pay as community property depending on the law of its jurisdiction, and former spouses may pursue any other remedy "available under law" to satisfy that interest. "Nothing" in the Former Spouses' Protection Act relieves military retirees of liability under such law if they possess other assets equal to the value of the former spouse's share of the gross retirement pay.

Under the Court's reading of the Act as precluding the States from characterizing gross retirement pay as community property, a military retiree has the power unilaterally to convert community property into separate property and increase his after-tax income, at the expense of his ex-spouse's financial security and property entitlements. To read the statute as permitting a military retiree to pocket 30 percent, 50 percent, even 80 percent of gross retirement pay by converting it into disability benefits and thereby to avoid his ob-

ligations under state community property law, however, is to distort beyond recognition and to thwart the main purpose of the statute, which is to recognize the sacrifices made by military spouses and to protect their economic security in the face of a divorce. Women generally suffer a decline in their standard of living following a divorce. See Weitzman, The Economics of Divorce: Social and Economic Consequences of Property, Alimony and Child Support Awards, 28 UCLA L. Rev. 1181, 1251 (1981). Military wives face special difficulties because "frequent change-of-station moves and the special pressures placed on the military spouse as a homemaker make it extremely difficult to pursue a career affording economic security, job skills and pension protection." S. Rep. No. 97–502, at 6. The average military couple married for 20 years moves about 12 times, and military wives experience an unemployment rate more than double that of their civilian counterparts. Brief for Women's Equity Action League et al. as *Amici Curiae* 10–11. Retirement pay, moreover, is often the single most valuable asset acquired by military couples. *Id.*, at 18. Indeed, the one clear theme that emerges from the legislative history of the Act is that Congress recognized the dire plight of many military wives after divorce and sought to protect their access to their ex-husbands' military retirement pay. See S. Rep. No. 97–502, at 6; 128 Cong. Rec. 18318 (1982) ("[F]requent military moves often preclude spouses from pursuing their own careers and establishing economic independence. As a result, military spouses are frequently unable to vest in their own retirement plans or obtain health insurance coverage from a private employer. Military spouses who become divorced often lose all access to retirement and health benefits — despite a 'career' devoted to the military") (remarks of Rep. Schumer). See also *id.*, at 18315, 18316, 18317, 18320, 18323, 18328. Reading the Act as not precluding States from characterizing retirement pay waived to receive disability benefits as property divisible upon divorce is faithful to

the clear remedial purposes of the statute in a way that the Court's interpretation is not.

The conclusion that States may treat gross military retirement pay as property divisible upon divorce is not inconsistent with 38 U. S. C. § 3101(a) (1982 ed., Supp. V). This anti-attachment provision provides that veterans' disability benefits "shall not be liable to attachment, levy, or seizure by or under any legal or·equitable process whatever, either before or after receipt by the beneficiary." Gaye Mansell acknowledges, as she must, that § 3101(a) precludes her from garnishing under state law Major Mansell's veterans' disability benefits in satisfaction of her claim to a share of his gross military retirement pay, just as § 1408(c)(1) precludes her from invoking the federal direct payments mechanism in satisfaction of that claim. To recognize that § 3101(a) protects the funds from a specific source, however, does not mean that § 3101(a) prevents Gaye Mansell from recovering her 50 percent interest in Major Mansell's gross retirement pay out of any income or assets he may have *other* than his veterans' disability benefits. So long as those benefits themselves are protected, calculation of Gaye Mansell's entitlement on the basis of Major Mansell's gross retirement pay does not constitute an "attachment" of his veterans' disability benefits. Section 3101(a) is designed to ensure that the needs of disabled veterans and their families are met, see *Rose* v. *Rose*, 481 U. S. 619, 634 (1987), without interference from creditors. That purpose is fulfilled so long as the benefits themselves are protected by the anti-attachment provision.

In sum, under the Court's interpretation of the Former Spouses' Protection Act, the former spouses Congress sought to protect risk having their economic security severely undermined by a unilateral decision of their ex-spouses to waive retirement pay in lieu of disability benefits. It is inconceivable that Congress intended the broad remedial purposes of the statute to be thwarted in such a way. To be sure, as the Court notes, Congress sought to be "fair and equitable" to re-

tired service members as well as to protect divorced spouses. *Ante*, at 593–594, and n. 19. Congress explicitly protected military members by limiting the percentage of disposable retirement pay subject to the federal garnishment remedy and by expressly providing that military members could not be forced to retire. See 10 U. S. C. §§ 1408(e)(1), 1408(e)(4)(B), 1408(c)(3). Moreover, a retiree is still advantaged by waiving retirement pay in lieu of disability benefits: the pay that is waived is not subject to the federal direct payments mechanism, and the former spouse must resort instead to the more cumbersome and costly process of seeking a state garnishment order against the value of that waived pay. See H. R. Rep. No. 98–700, pp. 4–5 (1984) (discussing difficulties faced by ex-spouses in obtaining state garnishment orders). Even these state processes cannot directly attach the military retiree's disability benefits for purposes of satisfying a community property division given the strictures of the anti-attachment provision of 38 U. S. C. § 3101(a). There is no basis for concluding, however, that Congress sought to protect the interests of service members by allowing them unilaterally to deny their former spouses *any* opportunity to obtain a fair share of the couple's military retirement pay.

It is now once again up to Congress to address the inequity created by the Court in situations such as this one. But because I believe that Congress has already expressed its intention that the States have the authority to characterize waived retirement pay as property divisible upon divorce, I dissent.