#29724-r-MES
**2023 S.D. 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

DANIEL PARKER,                              Plaintiff and Appellee,

    v.

CAMILLE PARKER,                              Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JON SOGN
Judge

\* \* \* \*

PATRICK DOUGHERTY of
Dougherty & Dougherty, LLP
Sioux Falls, South Dakota                    Attorneys for defendant
                                             and appellant.


VICTORIA M. DUEHR of
Bangs, McCullen, Butler,
   Foye & Simmons, LLP
Sioux Falls, South Dakota                    Attorneys for plaintiff
                                             and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
MAY 25, 2022
OPINION FILED **01/18/23**

#29724

SALTER, Justice

[¶1.]     Camille Parker appeals from the circuit court's judgment and decree of divorce, challenging the court's division of the military retirement for her former spouse, Daniel Parker.  Camille argues the circuit court abused its discretion in determining Daniel's military "monthly pay base" to be $1,500.94.  We vacate this portion of the court's decree and remand for further proceedings.

## Facts and Procedural History

[¶2.]     This case comes before us with a rather sparse record.  Missing are transcripts from the four-day divorce trial, and nearly all of the information relating to the property division issue presented here was not included in the record, but simply attached to the appellate briefs.  *See Batchelder v. Batchelder*, 2021 S.D. 60, ¶ 5 n.2, 965 N.W.2d 880, 882 n.2 (holding that the practice of attaching material not included in the record to briefs "does not comply with our rules for preparing appendices"); *Klutman v. Sioux Falls Storm*, 2009 S.D. 55, ¶ 37, 769 N.W.2d 440, 454 ("Documents in the appendix must be included within, and should be cross-referenced to, the settled record.") (citing SDCL 15-26A-60(8)).  Nevertheless, we have gleaned the following facts from explicit and contextual aspects of the record and briefs that appear to be undisputed.

[¶3.]     Daniel and Camille were married in June 2010.  Prior to their marriage, Daniel began serving as an enlisted member of the South Dakota Air National Guard.  His service continued during the marriage and, indeed, continues to the present time.

-1-

[¶4.]     At some point, Daniel also began serving in a civilian capacity for the National Guard.  In his civilian position, Daniel works as an avionic technician during the week.  In his military role, Daniel participates in guard drills and military training.  He is also subject to mobilization for active duty in the Air Force under federal authority.  *See* 10 U.S.C. § 12406 (authorizing the President to call "members and units of the National Guard of any State" to federal service).

[¶5.]     This "dual status," though perhaps somewhat novel, is specifically authorized under federal law and was recently the subject of a helpful exposition by the United States Supreme Court:

> As its name suggests, this rare bird has characteristics of two different statuses.  On one hand, the dual-status technician is a "civilian employee" engaged in "organizing, administering, instructing," "training," or "maintenance and repair of supplies" to assist the National Guard.  § 10216(a)(1)(C); 32 U.S.C. §§ 709(a)(1)–(2).  On the other, the technician "is required as a condition of that employment to maintain membership in the [National Guard]" and must wear a uniform while working.  10 U.S.C. § 10216(a)(1)(B); 32 U.S.C. §§ 709(b)(2)–(4).
>
> This dual role means that [dual-status] technicians perform work in two separate capacities that yield different forms of compensation.  First, they work full time as technicians in a civilian capacity.  For this work, they receive civil-service pay . . . .  Second, they participate as National Guard members in part-time drills, training, and (sometimes) active-duty deployment.  See 32 U.S.C. §§ 502(a), 709(g)(2).  For this work, they receive military pay and pension payments from a different arm of the Federal Government, the Defense Finance and Accounting Service.  *See* 37 U.S.C. §§ 204, 206; 10 U.S.C. § 113.

*Babcock v. Kijakazi*, 142 S. Ct. 641, 644, 211 L. Ed. 2d 424 (2022) (first brackets in original); *see also Moore v. Pa. Dep't of Mil. & Veterans Affs.*, 216 F. Supp. 2d 446, 450 (E.D. Pa. 2002) (explaining the concept of dual-status, hybrid employees).

[¶6.]     In any event, Daniel filed for divorce in May 2019, citing irreconcilable differences. As a result of either the parties' agreement or the circuit court's decision, all of the issues related to the equitable division of the marital estate were resolved following the court trial, with the exception of the division of Daniel's military retirement. It appears that the circuit court took this remaining issue under advisement at the completion of the trial, and the parties submitted argument to the court via email.

[¶7.]     Strictly speaking, Daniel's military retirement is a potential marital asset because it is conditioned upon him becoming eligible for retirement, which is most commonly associated with completing twenty years of satisfactory service. A spouse's prospective military retirement is subject to equitable division under state law as part of a divorce or legal separation proceeding, but the ultimate amount of the military retirement is controlled by federal law. Because Daniel serves in the National Guard, his service is classified as "non-regular," which is contrasted with the "regular" service of active duty military members. *See* 10 U.S.C. § 12739 (stating the formula for computing monthly retired pay for non-regular service members).

[¶8.]     Calculating monthly retired pay is different in some key respects for National Guard and reserve service members than it is for their active duty counterparts. Though a National Guard or reserve member's *eligibility* for retirement is most often determined by years of service, the *amount* of monthly

retired pay is significantly influenced by the number of military retirement points they accrue for drill and intermittent periods of active duty.[1]

[¶9.] In general terms, these retirement points are converted to corresponding years when a National Guard or reserve member begins to draw monthly retired pay using a statutory formula. *See* 10 U.S.C. § 12739. These years are then multiplied by a Guard or reserve member's "retired pay base," *id.*, also termed the "high-three average." *See* 10 U.S.C. § 1407(b) (defining high-three average). Commonly known simply as the "high-3," this amount is the 36-month average of the non-regular member's "monthly basic pay[,]" as explained more fully below. *See* 10 U.S.C. § 1407(d)(1).

[¶10.] A circuit court's effort to equitably divide a divorcing military spouse's future retirement in cases such as this one implicates these retirement rules as the court seeks to isolate and divide the service time that corresponds with the parties' marriage. Consequently, the number of a military spouse's retirement points along with the military paygrade and the years of service at the time of the divorce are all important to the retirement calculus for non-regular service.

[¶11.] Here, the parties agree that Daniel accrued 913 retirement points during his marriage to Camille and had earned a total of 2,370 retirement points as

---

1.    Retirement points are accrued as follows: one point for each day of active service, one point for each attendance at a four-hour drill period, one point for each day of performing funeral honors duty, and fifteen points for each year of membership in a reserve component. *See Reserve Retirement, Military Compensation*, U.S. Dep't of Def., https://militarypay.defense.gov/Pay/Retirement/Reserve.aspx (last visited Jan. 9, 2023).

of July 2019.[2]  Also undisputed is the fact that Daniel was serving as an Air Force master sergeant in the E-7 enlisted paygrade with sixteen years of service.  And significantly, the parties also seem to agree in principle that Camille should share equally in the portion of Daniel's military retirement attributable to the years they were married.  The parties disagree, however, about the correct amount of Daniel's high-3, and this is the principal issue before us in this appeal.

[¶12.]        For her part, Camille asserts the high-3 amount should be $4,895, citing the military's 2021 Monthly Basic Pay Table.  Camille justifies her position under the theory that Daniel is effectively serving on active duty given his dual-status role and proposed the following language for the circuit court's divorce decree:

> The former spouse is awarded 50% of the disposable military retired pay the member would have received had the member become eligible to receive military retired pay with retired base (High-3) of $4,895 and with 913 Reserve retirement points on July 31, 2019, the date of separation.  On the date of separation, July 31, 2019, the member's military pay grade (rank) was E7 and the member had Reserve retirement points 913, and the member had 16 years and XX months of service for basic pay purposes.

---

2.    For reasons that are not clear in the record, the parties and the circuit court used the amount of retirement points as of July 2019, not the amount earned as of the time of the divorce in July 2021.  This appears inconsistent with both state and federal law.  *See Ahrendt v. Chamberlain*, 2018 S.D. 31, ¶ 20, 910 N.W.2d 913, 921 ("[A]bsent special circumstances, assets and liabilities are valued at the time of trial rather than the time of separation."); *see also* 10 U.S.C. § 1408(a)(4)(B)(ii) (defining disposable retired pay as total monthly retired pay to which "the member would have been entitled using the member's retired pay base and creditable service points *on the date of the decree of divorce, dissolution, annulment, or legal separation*") (emphasis added).

[¶13.]     Daniel suggested a much lower high-3 amount of $1,500, which represented the average of his actual earnings as a National Guard member over the course of the previous thirty-six months.  He offered a different 50% formulation for the decree:

> The former spouse is awarded 50% of the disposable military retired pay the member would have received had the member become eligible to receive military retired pay with a retired base (High-3) of $1,500 and with 913 Reserve retirement points on July 31, 2019 . . . .

[¶14.]     Using the parties' somewhat incomplete legal arguments contained in emails, the circuit court opted for a third method which it included in the decree:

> If Daniel receives disposable military pay, Camille is awarded a percentage of Daniel's disposable military retired pay, to be computed by multiplying 50% times a fraction, the numerator of which is 913 retirement points earned during the period of the marriage, divided by the member's total number of reserve points earned.  On the date of the decree of divorce, July 6, 2021, Daniel's military pay base (high-3) was $1,500.94 and the member had 2370 retirement points total at the time of valuation of July 2019.

[¶15.]     Camille appeals, and in her initial appellate briefing, her argument remained fixed, incorrectly, on the idea that Daniel's dual-status role equates to him actually serving on active duty and not as a part-time member of the National Guard.  Daniel's initial brief centered on his perspective of the equities, stating, "To use the income of $4,895.10 as set forth in the table submitted by Camille as Dan's base high 3, when he has only had an actual earned average of $1,500.94, is unjust and defeats the intent of the . . . federal government."  Neither party cited any applicable federal statutes or controlling decisional law addressing the topic of

military retirement benefits or the selection of a high-3 figure ancillary to divorce or legal separation proceedings.

[¶16.] Seeking further development of the parties' legal arguments and recalling our decisional law applying the federal Uniformed Services Former Spouses Protection Act (USFSPA),[3] we ordered simultaneous supplemental briefing to address "[t]he application, if any, of 2017 and 2018 amendments to the [USFSPA], codified at 10 U.S.C. § 1408(a)(4)(B), and any related provisions of federal law (including 10 U.S.C. 1407(d)(1)), to the circuit court's division of Daniel Parker's military pension."

[¶17.] Both parties augmented their original briefs with citations to applicable federal statutory authority. The parties each remained committed to their respective arguments concerning Daniel's correct high-3, but Camille appears to have pivoted to a textual analysis of 10 U.S.C. § 1407(d)(1) as the reason for using the $4,895.10 from the Monthly Basic Pay Table, rather than claiming Daniel's dual-status role equated to him serving on active duty.

## Analysis

### *Calculating Disposable Retired Pay for Non-Regular Service*

[¶18.] We have treated "military retirement benefits . . . like any other asset of the marriage and . . . subject to equitable distribution." *Porter*, 1996 S.D. 6, ¶ 9, 542 N.W.2d at 450; *see also Gibson v. Gibson*, 437 N.W.2d 170, 172 (S.D. 1989) (holding that a military pension is a marital asset subject to equitable division upon

---

3. *See, e.g., Porter v. Porter*, 1996 S.D. 6, 542 N.W.2d 448; *Hisgen v. Hisgen*, 1996 S.D. 122, 554 N.W.2d 494; *Urbaniak v. Urbaniak*, 2011 S.D. 83, 807 N.W.2d 621; *see also Cook v. Cook*, 2022 S.D. 74, ¶ 22, ___ N.W.2d ___.

divorce). The division of marital assets upon divorce is reviewed for an abuse of discretion. *Gibson*, 437 N.W.2d at 171. We have held that an error of law in a circuit court's equitable division of property "is never within the [discretionary] range of permissible choices and necessarily constitutes an abuse of discretion." *Field v. Field*, 2020 S.D. 51, ¶ 15, 949 N.W.2d 221, 224 (citation omitted).

[¶19.] But the fact that a military retirement is subject to equitable division "like any other asset of the marriage" does not mean it is actually like other assets. Military retirements are, in many ways, unique even within the class of pension and retirement assets. We believe, therefore, that it is useful to first discuss the authority of state courts to divide a divorcing spouse's military retirement before we consider whether the circuit court abused its discretion when it fixed Daniel's high-3 at $1,500.

[¶20.] In 1981, the United States Supreme Court issued its decision in *McCarty v. McCarty*, 453 U.S. 210, 101 S. Ct. 2728, 69 L. Ed. 2d 589 (1981), holding that "the federal statutes then governing military pay prevented state courts from treating military retirement pay as community property." *Mansell v. Mansell*, 490 U.S. 581, 584, 109 S. Ct. 2023, 2026, 104 L. Ed. 2d 675 (1989). "In direct response to *McCarty*, Congress enacted the [USFSPA]," codified at 10 U.S.C. § 1408, "which authorizes state courts to treat '*disposable retired or retainer pay'* as community property." *Mansell*, 490 U.S. at 584, 109 S. Ct. at 2026 (emphasis added) (citing 10 U.S.C. § 1408(c)(1)).

[¶21.] The USFSPA is, therefore, both the source and the ceiling of a state court's authority to divide a spouse's military retirement. And though it neutralized

the essential holding in *McCarty*, the USFSPA did not vest state courts with unlimited authority to divide military retirements. Instead, the USFSPA authorizes state courts to divide "disposable retired pay," which is a specific statutorily defined term under the provisions of 10 U.S.C. § 1408(a)(4)(A). *See Mansell*, 490 U.S. at 589, 109 S. Ct. at 2029 (holding that "under the [USFSPA's] plain and precise language, state courts have been granted the authority to treat *disposable retired pay* as community property; they have not been granted the authority to treat *total retired pay* as community property") (emphasis added).

[¶22.]      In cases such as this one where a divorcing military spouse is a member of the National Guard with non-regular service and not yet eligible for retirement, the USFSPA defines disposable retired pay as follows:

> [T]he total monthly *retired pay* to which the member is entitled shall be . . . the amount of retired pay to which the member would have been entitled[,] *using the member's retired pay base and creditable service points on the date of the decree of divorce,* . . . under chapter 1223 of this title . . . .

10 U.S.C. § 1408(a)(4)(B)—§ 1408(a)(4)(B)(ii) (emphasis added); *see also* DoD FMR 7000.14-R, vol. 7B, ch. 29, paragraph 8.2.1 ("The amount of retired pay is limited to that which the member would have been entitled using the member's retired pay base (rank or high-3) and years of service on the date of the final decree of divorce . . . .").

[¶23.]      Established through congressional amendments in 2017 and 2018, this has become known as the "frozen benefit rule." 172 Am. Jur. *Trials* § 271 (2022). Under the frozen benefit rule, the date of divorce serves as a hypothetical retirement date for the purpose of calculating the former spouse's equitable share of

a military spouse's retirement, the rationale being that it would be inequitable for the former spouse to receive a share of the retired pay based upon pay increases that occurred between the date of divorce and the member's actual date of retirement "to which the former spouse made no contribution." *Fulgium v. Fulgium*, 203 A.3d 33, 40 (Md. Ct. Spec. App. 2019).[4]

[¶24.]     Freezing a military spouse's potential disposable retired pay at the time of the divorce implicates, according to the express terms of § 1408(a)(4)(B), the retirement rules for calculating "retired pay" for non-regular service set out in chapter 1223 of Title 10.  In particular, 10 U.S.C. § 12739 describes monthly retired pay as the product of "(1) the retired pay base" and "(2) 2 ½ percent of the years of service credited . . . ."  10 U.S.C. § 12739(a).

[¶25.]     The retired pay base is also known as the high-3 figure, which permeates this case.  For non-regular service, the high-3 is "the total amount of

---

4.     Many military retirement awards to non-military spouses are administered through the Defense Finance and Accounting Service (DFAS), *see infra* ¶¶ 33–35, and DFAS recognizes several accepted methods for segregating the portion of a military spouse's retirement that corresponds to the marriage before applying the "frozen benefit rule," which then functions as a cap on the share that the non-military divorcing spouse will receive.  For instance, the "formula award" utilized by the circuit court here takes points accumulated during the marriage over total points at the time of divorce and is specifically contemplated according to guidance from DFAS.  *See* DoD FMR 7000.14-R, vol. 7B, ch. 29, fig.29-2 (listing four types of sample awards, including a "formula award" for a "Military Retired Pay Division Order . . . that occur[s] after December 23, 2016").  However, the recent amendments to the USFSPA provide for a compensation rate that has been "frozen" based on a member's high-3 and points at the time of the divorce, rather than as a percentage of the military spouse's ultimate monthly disposable retired pay based upon longevity and promotions occurring after the termination of the marriage. *Compare* 10 U.S.C. § 1408 *with Hautala v. Hautala*, 417 N.W.2d 879, 880 n.1 (S.D. 1988) (describing a "time" formula for dividing a military spouse's retirement that does not freeze the benefit at the time of divorce).

monthly basic pay to which the member or former member was entitled during the member or former member's high-36 months (or to which the member or former member would have been entitled if the member or former member had served on active duty during the entire period of the member or former member's high-36 months), divided by . . . 36." 10 U.S.C. § 1407(d)(1)(A)-(B). The correct interpretation of this statute represents a critical juncture in our analysis.

[¶26.] Based on his supplemental briefing, Daniel reads the parenthetical information within this statutory language disjunctively—*i.e.* he can elect to use as his high-3 amount either the higher compensation rates that he would have earned on active duty, or the lower compensation amount represented by his actual drill pay. But we believe this interpretation is unsustainable and too expedient given the text of the statute and accepted rules of statutory construction.[5]

[¶27.] Textually, Daniel's argument that the parenthetical phrase allows him to calculate his high-3 based upon the money he actually earned as a drilling National Guard member overlooks the critical term "monthly basic pay." When Daniel completes standard monthly part-time drills, he is not earning *monthly basic pay* as provided in 10 U.S.C. § 1407(d)(1)(A)—he is earning *military reserve drill pay* commensurate with his rank/paygrade and years of service. The distinction is illustrated by the fact that the Department of Defense publishes two military pay tables, one the "Monthly Basic Pay Table" and the other detailing "Military Reserve

---

5. Daniel's position also seems improvident over the long term. If he was truly convinced his high-3 should be based on the lower compensation rates represented by his drill pay, his view would artificially, and significantly, reduce his ultimate monthly retired pay amount.

Drill Pay."[6] As a result, his actual earnings derived from drills do not constitute the "monthly basic pay" explicitly referenced in the text of 10 U.S.C. § 1407's definition of high-3.

[¶28.]        In addition, the use of parentheses in 10 U.S.C. § 1407(d)(1)(A) is relevant to its interpretation. Though all judicial efforts to construe statutes must be singularly focused upon ascertaining legislative intent, the fact that Congress included parentheses counsels against Daniel's disjunctive interpretation which omits them entirely. *See Peters v. Ashcroft*, 383 F.3d 302, 309 (5th Cir. 2004) (holding that "Congress . . . reduced the grammatical import" of statutory text "when it replaced commas . . . in the predecessor provision with the parentheses that now appear"). Indeed, Congress's use of parenthetical phrases may be descriptive of an antecedent term or provision and not a limitation of it. *See Germain v. U.S. Att'y Gen.*, 9 F.4th 1319, 1326 (11th Cir. 2021) (noting that Congress's use of parentheticals in the Immigration and Naturalization Act "are merely descriptive—rather than limiting").

[¶29.]        Drawing upon this persuasive authority, we view the parenthetical used in 10 U.S.C. § 1407(d)(1)(A) as illustrative of the previous phrase and not an entirely new disjunctive provision, as Daniel asserts. The parenthetical phrase is

---

6.    The Monthly Basic Pay Table is updated annually, as authorized by 37 U.S.C. § 203 and 37 U.S.C. § 1009, and published online in "monthly basic pay tables" by DFAS oftentimes at the direction of a Presidential Executive Order. *See* Adjustments of Certain Rates of Pay, 86 Fed. Reg. 73601 (Dec. 22, 2021); Military Pay Tables & Information, Def. Fin. & Acct. Serv., https://www.dfas.mil/militarymembers/payentitlements/Pay-Tables/. The Military Reserve Drill Pay chart lists one- and four-drill pay amounts that are proportionate increments of the corresponding monthly basic pay amount.

particularly helpful as a means of clarifying the use of the term "monthly basic pay" to mean the amount a member of the National Guard or reserve would earn if serving on active duty. Read in this way, the statute defines high-3 as "the total amount of *monthly basic pay* to which the member or former member was entitled during the member or former member's high-36 months" or, in other words, the amount "to which the member or former member would have been entitled *if the member or former member had served on active duty* during the entire period. . . ." (Emphasis added.)

[¶30.]     In sum, then, a circuit court can only divide disposable retired pay, which can, in turn, only be calculated using a service member's correct high-3. For service members with non-regular service, this number is based upon the applicable Monthly Basic Pay Tables as if the service member was on active duty, whether they were or not.

**The Circuit Court's Order**

[¶31.]     After tracing the definition of "disposable retired pay" through a succession of statutory provisions to the point it intersects with a service member's high-3 amount, we conclude the circuit court's division of Daniel's military retirement includes a legal error. The court's order reflects Daniel's incorrect legal interpretation of his high-3 amount.

[¶32.]     This error has the effect of undervaluing Daniel's potential military retirement at the time of divorce, resulting in what we would expect to be a significantly smaller share for Camille than would be the case if Daniel's high-3

were accurately calculated.[7]  Nothing in the record indicates the circuit court intended this result.  To the contrary, all appearances are that the court intended to award Camille one-half of Daniel's retirement for the time that corresponded to the years of their marriage.  Under the circumstances, we must vacate the portion of the court's divorce decree dividing Daniel's military retirement and remand the case for further proceedings.

### *The Payment Mechanism of the USFSPA*

[¶33.]    In addition to conferring a certain degree of authority upon state courts to treat "disposable retired pay" as marital property, the *Mansell* Court described a second major feature of the USFSPA that has potential utility in dividing Daniel's military benefit:

> The Act also creates a payments mechanism under which the Federal Government will make direct payments to a former spouse who presents, to the Secretary of the relevant military service, a state-court order granting her a portion of the military retiree's disposable retired or retainer pay.  This direct payments mechanism is limited in two ways.  § 1408(d).  First, only a former spouse who was married to a military member "for a period of 10 years or more during which the member performed at least 10 years of service creditable in determining the member's eligibility for retired or retainer pay," § 1408(d)(2), is eligible to receive direct community property payments.  Second, the Federal Government will not make community property payments that exceed 50 percent of disposable retired or retainer pay.  § 1408(e)(1).

---

7.    The record does not, at this point, contain sufficient information to precisely calculate Daniel's high-3 using the annual Monthly Basic Pay Tables for the thirty-six months preceding the parties' July 2021 divorce.  But using the "most recent" basic pay amount from the 2021 Monthly Basic Pay Table suggests that the current calculation using actual drill pay may reduce Camille's award by approximately two-thirds of what it would be using the correct high-3 amount.

*Mansell*, 490 U.S. at 585, 109 S. Ct. at 2027.

[¶34.]     The Supreme Court clarified that "state courts have been granted the authority to award a portion of disposable military retired pay to former spouses who were married to the military member for less than 10 years, but such former spouses may not take advantage of the direct payments mechanism." *Id.*, 490 U.S. at 591 n.13, 109 S. Ct. at 2030 n.13.  Several courts have extended similar reasoning to the former spouse's 50% cap, holding that state courts maintain discretion to award more than 50% of retirement benefits to a military spouse but such an order will not be paid directly, at least in its entirety, by the Federal Government.  *See Meyer v. Meyer*, 952 So. 2d 384, 387 (Ala. Civ. App. 2006), *Deliduka v. Deliduka*, 347 N.W.2d 52, 55 (Minn. Ct. App. 1984), *In re Marriage of Bocanegra*, 792 P.2d 1263, 1267 (Wash. Ct. App. 1990).

[¶35.]     Here, the parties were married for more than ten years, and it does not seem that Daniel, Camille, or the circuit court envision a property award that exceeds 50% of Daniel's disposable retired pay.  Therefore, it appears DFAS could provide direct payments to Camille, and if the court is inclined to explore utilizing this payments mechanism on remand, Volume 7B, Chapter 29 of the Department of Defense rules and regulations, entitled "Former Spouse Payments From Retired Pay," provides instruction on how DFAS interprets division of military retirement court orders and provides sample court orders that are routinely accepted by DFAS. *See* DoD FMR 7000.14-R, vol. 7B, ch. 29.

**Conclusion**

[¶36.]     The abridged record here, "insofar as it exists[,]" reveals a legal error in the application of federal law to determine Daniel's high-3 amount. *See Graff v. Children's Care Hosp. & Sch.*, 2020 S.D. 26, ¶ 16, 943 N.W.2d 484, 489 (holding "appellate review in the absence of a transcript is not categorically precluded in all cases," but rather may be undertaken "insofar as [the record] exists"). This error prejudiced Camille because it substantially reduced what we believe the circuit court intended to be a true reflection of an equal share of Daniel's disposable retired pay attributable to time he and Camille were married. We, therefore, vacate the portion of the court's divorce decree dividing Daniel's military retirement and remand the case for further proceedings.[8]

[¶37.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.

---

8.     Both parties have submitted requests for appellate attorney's fees which are authorized in the circuit court and on appeal, so long as they are reasonable. *See* SDCL 15-17-38, 15-26A-87.3. However, we decline to grant attorney's fees here.