**Robert M. LEISURE, Appellant–Plaintiff,**

v.

**Debra Lynn LEISURE, Appellee–Defendant.**

No. 53A04–9012–CV–00589.

Court of Appeals of Indiana,
Fifth District.

March 30, 1992.

Rehearing Denied May 8, 1992.

Douglas Norris, Cambridge City, for appellant-plaintiff.

James P. Sheldon, Lewellyn H. Pratt, Bloomington, for appellee-defendant.

SHARPNACK, Judge.

Robert Leisure (Husband) appeals from the trial court's dissolution decree and denial of his consolidated motion for change of venue from judge and recusal. We affirm in part, reverse in part and remand.

Husband raises eight issues for review which we restate as:

1. Whether the trial court erred in denying Husband's consolidated motion for change of venue from judge and recusal.
2. Whether Husband's federal workers' compensation benefits (OWCP) were a divisible marital asset under Indiana law.
3. Whether Husband's right to receive OWCP benefits had to vest prior to the date of final separation in order to be divisible, or whether the relevant date was the date of the dissolution decree.

4. Whether federal law preempted the application of Indiana domestic relations law to the extent that Indiana law allowed the division of Husband's OWCP benefits.
5. Whether, for the purpose of calculating child support, the trial court erred by declining to attribute an income to Wife from the kennel business awarded to her pursuant to the court's property division.
6. Whether, for purposes of calculating child support, the trial court erred by attributing to Husband's income the portion of OWCP benefits awarded to Wife under the property division.
7. Whether the trial court erred in denying Husband's petition to modify the provisional order.
8. Whether the trial court erred by dividing $20,000 representing the amount due Husband as the difference between the civil service disability (OPM) he originally received and the OWCP benefits for which he was subsequently approved.

Robert and Debra Lynn Leisure (Wife) were married on October 27, 1973. The marriage produced two children, a daughter (Daughter) age 15 at the time of the dissolution hearing, and a son age 13 at the time of the hearing. Husband began employment with the Federal Aviation Administration (FAA) in 1974, and he worked with the FAA as an air traffic controller throughout the marriage until applying for immediate medical retirement on March 29, 1989.

Husband went to a psychiatrist, Dr. Judith Klein, on August 8, 1988, complaining of constant headaches, lack of concentration and sleeplessness, as well as other symptoms. Dr. Klein diagnosed Husband as suffering from chemical depression, mixed migraine headaches and fibermyalgia, which is a muscular disorder resulting in spasms and swelling. Dr. Klein testified that Husband's problems were stress related. She initially prescribed Immepromine and Husband continued upon that medication until the time of the dissolution hearing. Dr. Klein testified that Husband's symptoms would probably return if he were to stop taking his medication.

Husband lost his medical qualification to work as an air traffic controller. His supervisor assigned him to administrative duties effective August 11, 1988. Husband applied for immediate medical retirement on March 29, 1989. Shortly thereafter, on May 9, 1989, Wife filed a petition for dissolution. On July 16, 1989, the United States Office of Personnel Management notified Husband that he was eligible to receive disability benefits (hereinafter "OPM" benefits) in the net amount of $1555.23 per month. The statute governing the eligibility of a civil service employee for such benefits is found at 5 U.S.C. § 8337. The OPM benefits are payable to eligible employees who are found "to have become disabled" and are retired on their own application or that of the agency employing them. 5 U.S.C. § 8337(a). At the same time he applied for OPM benefits, Husband also applied for federal workers' compensation benefits, administered by the Office for Workers' Compensation Programs (hereinafter OWCP benefits) administered under 5 U.S.C. §§ 8101 through 8193. The OWCP benefits are payable for disability "resulting from personal injury sustained while in the performance of ... duty...." 5 U.S.C. § 8102. On February 28, 1990, Husband was notified of his right to receive OWCP benefits in the net amount of $3270.68 every four weeks. Husband was eligible to receive those benefits retroactive to July 16, 1989, but the Office of Personnel Management was entitled to reimbursement for the amount of OPM benefits actually paid to Husband.

Wife filed a request for a provisional order with her petition for dissolution. The court entered a provisional order on June 9, 1989 following an evidentiary hearing. On July 18, Husband filed a motion to modify the provisional order, which the court denied following an evidentiary hearing. Husband based his motion upon a reduction in his income which occurred after the hearing on the provisional order.

The parties had operated a kennel during the marriage. The kennel was a marginally successful business. Pursuant to the terms of the provisional order, Wife operated the kennel for most of the year immediately prior to the final dissolution hearing. The kennel had a net operating profit of $2093.41 for that year.

At the final dissolution hearing, the parties testified about numerous problems Daughter had experienced. Some of the evidence indicated that Daughter had taken Wife's car against Wife's express wishes, had become intoxicated on several occasions, and had dated men five to ten years her seniors. Based on that evidence, the court, *sua sponte*, issued an order referring Daughter to the juvenile probation department for "whatever investigation and other proceedings officers of that department decide are appropriate under the circumstances...." (Record, 108). Seven days later, on June 1, 1990, the trial court entered an "Order of Wardship" stating:

> "The Court is informed that the Husband intends to take the parties' minor daughter ... from Bloomington High School North and to immediately depart with her for the State of Florida (the Court being advised that [Daughter] told her mother that the Husband said he was), because he was very upset with the Court's referral of [Daughter] to the Juvenile Probation Department. The Court believes this both because of the Husband's conduct and the testimony at the final hearing in this cause, and because his attorney has expressed great displeasure with the said order to the Wife's attorney."

(Record, 109.)

In response to the above order, Husband filed a consolidated verified motion for change of venue from judge and for recusal. Husband claimed that the trial court had received an improper *ex parte* communication regarding custody issues and had relied upon that communication, thus rendering the court biased. At the hearing on Husband's motion, the trial court stated that it had received the information referred to in its order from the juvenile probation department and had called Wife's counsel to verify the information. The court denied Husband's motion.

On September 5, 1990, the court entered a decree of dissolution. The findings and conclusions accompanying the decree state, in relevant part:

"1. Pursuant to testimony of Husband's medical expert, Dr. Judith Klein, the court finds that Husband has been medically disabled since August 8, 1988, and that any monthly [OPM] payments or [OWCP] payments received and to be received are assets of the marriage to be divided by the Court....

Husband has been receiving the gross monthly sum of $1656 as a [OPM] payment commencing July 16, 1989 until the present time. Husband has been found to be entitled to presently receive the sum of $3270.68 each four weeks as [OWCP] retroactive from July 16, 1989 and a lump sum amount equal to the difference between the [OPM] payments and [OWCP] payment for the entire period for the approximate sum of $20,000. The Court finds that since certain contingencies may terminate the [OWCP] benefits and subsequently the [OPM] benefits, said benefits should be divided as they are received between Husband and Wife. Thus if Husband's benefits should expire so would Wife's.

\* \* \* \* \*· \*

13. [T]he court finds that the present value of Husband's Disability Pension is the sum of $404,735.

14. [T]he Court finds [Husband's] compensation to have the present value of $769,633;

15. Wife has continued to work at Cove Kennel business and although she has managed to reduce the indebtedness of said business, she has not been able to generate a positive cash flow to date. Wife believes she will be able to make it a profitable business in approximately 2 years. That for the purposes of calculating support, Wife should not be imputed to have an income from said kennel for a period of two years."

(Record, 153–156.) Based upon its findings, the trial court entered the following order, in relevant part:

"5. That as support for the minor children of the parties Husband shall pay the sum of $185.00 per week....

\* \* \* \* \* \*

10. Husband is in indirect contempt of Court for failing to comply with the Provisional Order relative to the making of the monthly mortgage payment of the marital residence. Husband shall pay to Wife the sum of $8,420 within thirty (30) day from the date of this order, which sum represents the ten (10) monthly mortgage payments that Husband was ordered to pay in the Provisional order.

\* \* \* \* \* \*

17. As a division of marital assets, Husband shall cause to be paid to Wife one-half (½) of any and all monthly payments he receives for [OPM] or [OWCP] compensation....

18. Wife shall be entitled to one-half (½) ... of Husband's Civil Service Retirement pension which the Court has found to have a present value of $37,583. That this is to be accomplished by a "Qualified Domestic Relations Order" to be prepared in a form hopefully acceptable to the U.S. Government. That said "Qualified Domestic Relations Order" shall also provide that Wife shall have a lien on Husband's one-half (½) share of said pension to secure payment to Wife of one-half (½) of the retroactive lump sum payment to Husband in the approximate sum of Twenty Thousand Dollars as hereinafter provided."

(Record, 153–160).

■ Husband first claims that the trial court committed error by denying his consolidated motion for recusal and change of venue from judge. He contends that the trial court's June 1 order making Daughter a ward of the court was based upon an improper *ex parte* communication between the judge and both the probation department and Wife's attorney. He cites to Canon 3(A)(4) of the Code of Judicial Conduct which states that, except as authorized by law, a judge should "neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding."

Neither party has provided us with a clear picture of the the actual effect of the trial court's order of referral or of the authority upon which such order was premised. Nor have the parties provided us with the authority under which the trial court issued the order making Daughter a ward of the court. The orders themselves shed no light on their authoritative source. The trial court apparently issued the orders incidental to its determination of the issues presented in the dissolution proceedings. An understanding of the legal bases for the two orders may be essential to a determination of whether there was in fact an improper *ex parte* communication, because Canon 3(A)(4) only prohibits initiation or consideration of such communications "except as authorized by law."

However, the precise error alleged by Husband is the denial of his consolidated motion for change of venue from judge and for recusal. The basis for that motion was that the trial court's exposure to the alleged *ex parte* communication rendered the judge unable to act in a fair and impartial manner. Upon review of a trial judge's decision not to disqualify himself, we presume that the trial judge is unbiased.[1] *Dahlin v. Amoco Oil Corp.* (1991), Ind. App., 567 N.E.2d 806, 813. In order to overcome that presumption, the appellant must demonstrate actual personal bias. *Id.* Unless presented with evidence to the contrary, we assume that the judge would have complied with the obligation to disqualify himself had there been any reasonable question concerning his impartiality. *Id.*

■ Husband contends that the very nature of the *ex parte* communications upon which the trial court relied necessarily prejudiced the court against him with regard to the many issues still under consideration. We disagree. As noted, Husband does not appeal the trial court's order making Daughter a ward of the court, which was the issue directly affected by the *ex parte* communications. Instead, Husband claims

that the trial court's belief that Husband was going to intentionally subvert the court's referral of Daughter to the juvenile probation department rendered the court unable to resolve the remaining issues in a fair manner. However, the propriety of the manner in which such information came to the court's attention is not controlling as to Husband's claim. If the information had come before the court at an evidentiary hearing, the same question would arise as to whether the trial court could fairly adjudicate the remaining issues. Without any additional evidence that such information biased the judge, we presume that the judge remained unbiased.

Husband relies upon *Stivers v. Knox County Department of Public Welfare* (1985), Ind.App., 482 N.E.2d 748. In that case, the trial judge was exposed to information regarding the cause in question prior to it being filed in his court due to his participation on a community child protection team. *Id.* at 749. The appellate court noted that the facts of the case implicated several canons of the Code of Judicial Conduct. 482 N.E.2d at 750. The court reasoned that, at worst, the case was a classic example of an *ex parte* communication prohibited by Canon 3(A)(4): a prospective litigant discussing potential litigation as well as admissibility of evidence in the presence of the judge but outside the presence of the other party. At best, the situation was one which had every appearance of impropriety and impartiality thus detracting from the integrity of the judiciary. 482 N.E.2d at 751. The court reversed the trial court's adjudication of the appellant's daughter as a child in need of services. *Id.*

The case before us is distinguishable from *Stivers*. In *Stivers*, the *ex parte* communications went to the fundamental issue of the case, whether the child was a child in need of services. Here, the content of the communication in question went to an incidental issue. Although the communications might have been related to custody issues, Husband has not appealed the change of judge.

---

1. The request for change of judge was not within the time limits of T.R. 76 for an automatic

trial court's custody determination and therefore makes no claim that he was prejudiced with regard to those issues. The veracity of the information was not significantly related to the division of property or the allocation of support, which are the issues involved in Husband's appeal.

*Stivers* does not discuss the necessity that the appellant demonstrate bias in order to prevail on a claim of error for failure of the trial court to recuse itself. However, we read *Stivers* to mean that the circumstances of the case overcame the presumption that the trial court was unbiased and created such an appearance of impropriety that reversal was mandated. The canons do not create the legal standard for review of a trial judge's decision not to recuse himself. The appellant still must demonstrate actual bias. *See Harrington v. State* (1992), Ind., 584 N.E.2d 558.

■ Husband next contends that the trial court erred by dividing his future OWCP benefits because his right to receive such payments is not a marital asset subject to division in a dissolution proceeding. We disagree.

IND.CODE § 31–1–11.5–11(b) provides that, in a dissolution action, the trial court "shall divide the property of the parties in a just and reasonable manner...." IND. CODE § 31–1–11.5–2(d) defines property as:

> "all the assets of either party or both parties, including:
> (1) a present right to withdraw pension or retirement benefits;
> (2) the right to receive pension or retirement benefits that are not forfeited upon termination of employment, or that are vested, as that term is defined in Section 411 of the Internal Revenue Code, but that are payable after the dissolution of marriage; and
> (3) the right to receive disposable retired or retainer pay, as defined in 10 U.S.C. 1408(a), acquired during the marriage, that is or may be payable after the dissolution of marriage."

In *Gnerlich v. Gnerlich* (1989), Ind.App., 538 N.E.2d 285, the court held that the trial court had appropriately characterized the husband's right to monthly disability benefits as marital property. *Id.* at 288. The trial court had divided husband's disability pension, which was at least partially funded by his contributions to an insurance company through a plan offered by his employer, and ordered the husband either to arrange for the wife to be paid directly or to remit her portion upon receipt each month. 538 N.E.2d at 286. The appellate court rejected the husband's argument that the trial court had divided a future stream of income. The court also rejected the husband's argument that the disability benefit had no readily ascertainable value and distinguished *Murphy v. Murphy* (1987), Ind.App., 510 N.E.2d 235 and *McNevin v. McNevin* (1983), Ind.App., 447 N.E.2d 611. *Murphy* involved an unliquidated tort claim and *McNevin* involved a workers' compensation claim, the husband's right to receive which was pending on appeal. The court concluded that, unlike the case before it, the parties in those cases had nothing resembling a present vested interest and valuation would have been pure hypothesis. *Gnerlich* 538 N.E.2d at 287.

In reaching its conclusion that the husband's rights to disability benefits were sufficiently vested and ascertainable, the *Gnerlich* court noted that, prior to the amendment of I.C. § 31–1–11.5–2(d), retirement pensions contingent upon the retiree's survival were not considered sufficiently vested to be marital property, but that, post-amendment, such pensions were characterized as marital property. 538 N.E.2d at 287. The *Gnerlich* court reasoned that the husband's disability pension was sufficiently similar to a longevity pension for the purpose of characterization as marital property. Furthermore, the *Gnerlich* court refuted the husband's claim that the disability pension was too speculative to be divided because future payments were premised upon the contingency that he remain disabled by pointing out that the trial court had awarded the wife a percentage of each monthly payment. Therefore, the court reasoned, as did the trial court here, that her interest would expire if and when the husband's interest expired. *Id.*

We are guided by *Gnerlich* in our resolution of this case. Husband attempts to distinguish *Gnerlich* upon grounds that the disability pension in that case was a private pension whereas Husband receives his OWCP benefits pursuant to a federal statute. The *Gnerlich* court did not rely upon the private nature of the disability pension in reaching its decision. If the fact that a portion of the benefits represent compensation for personal loss, and diminished future earning capacity does not remove a disability pension from the category of divisible property, then the fact that Husband did not pay premiums from the marital pot should not affect the divisibility of the benefits. The key is whether Husband's right to the benefits was sufficiently vested, and in that regard, this case is identical to *Gnerlich*.

■ Husband also claims that I.C. § 31–1–11.5–2(d)(3) specifically excludes OWCP benefits because that subsection includes the right to receive disposable retired or retainer pay as defined in 10 U.S.C. 1408. According to Husband, 10 U.S.C. 1408(a)(4), which defines "disposable retired or retainer pay," specifically excludes retired pay for a member retired for disability. Therefore, Husband concludes that I.C. § 31–1–11.5–2(d)(3) must exclude payments premised upon disability. Husband's argument fails, however, because I.C. § 31–1–11.5–2(d)(3) does not purport to exclude property, rather it specifically includes certain *military* retirement pay that the federal statute deems to be divisible by state courts. 10 U.S.C. § 1408 does not pertain to workers' compensation benefits which are administered under a different title of the United States Code.

■ Husband next contends that his OWCP rights are personal rights which must have been acquired prior to the date of the filing of the dissolution petition in order to be divisible. According to Husband, he did not have a vested right to receive such payments until after Wife had filed her dissolution petition, and therefore, his right to payments was not divisible.[2]

While the parties were married, Husband lost his medical clearance to operate as an air traffic controller, and, on August 11, 1988, he requested to be assigned to administrative duties. He was reassigned to administrative duties shortly thereafter. On March 29, 1989, Husband applied for immediate retirement. Wife filed her petition for dissolution on May 9, 1989. On January 23, 1990 Husband received a letter stating that he had been approved for OPM benefits effective July 14, 1989. On February 14, 1990, Husband filed with the Office of Workers Compensation Programs an election to receive OWCP benefits in preference to his OPM benefits. In a letter dated February 23, 1990, the Office of Workers Compensation Programs sent the Office of Personnel Management a letter stating that .they would begin paying OWCP benefits effective retroactively to July 16, 1989.

IND.CODE § 31–1–11.5–11(b) provides that a court shall divide the following three classifications of property of the parties:

1. property owned by either spouse prior to the marriage;
2. property acquired by either spouse in his or her own right after the marriage and prior to the date of final separation, and;
3. property acquired by the joint efforts of the parties.

Subsection (a) of the above statute provides that the date of final separation is the date the petition for dissolution is filed.

In *In re Marriage of Adams* (1989), Ind., 535 N.E.2d 124, our supreme court addressed the question of whether the trial court erred by dividing the husband's police pension, which did not become marital "property" under I.C. § 31–1–11.5–2(d)(2) until after he had filed for dissolution. *Id.* at 126. The court interpreted the statute to mean that the requirement that property be acquired "prior to the date of final separation" only applies to property acquired in

---

2. Wife contends that Husband failed to properly frame this issue in his appellate brief. While Husband did not frame this issue in his statement of issues and his discussion of this issue is somewhat confusing, he has sufficiently presented it for appeal.

a party's "own right." 535 N.E.2d at 127. The court reasoned that, in many marriages, the joint efforts of both spouses are invested so that one of them may earn pension rights. In the case before it, the court held that there was sufficient evidence to support the conclusion that the husband's pension rights were accumulated by the joint efforts of the parties where the parties had been married for twenty years, during which time the husband had accumulated pension rights. *Id. See also Staller v. Staller* (1991), Ind.App., 570 N.E.2d 1328, 1331–1332; *In re Marriage of Bickel* (1989), Ind.App., 538 N.E.2d 246.

We hold that Husband's right to receive OWCP benefits is sufficiently similar to the husband's pension rights in *Adams* to be viewed as gained through the joint efforts of the parties. Husband's injuries arose during the course of the marriage and stemmed from the job he held for a period coinciding almost exactly with the duration of the marriage. Therefore, the fact that Husband's right to receive OWCP benefits vested after the date of final separation does not affect the divisibility of that asset.

Husband next claims that, even if we conclude that his OWCP benefits are divisible under Indiana law, the trial court erred in dividing those benefits because federal law preempts the application of state law in such a case. We disagree.

State laws concerning domestic relations are afforded special deference when considering whether, by operation of the supremacy clause, federal law preempts the application of state law. On the rare occasion when state family law conflicts with a federal statute, the Supreme Court limits its inquiry to the question of whether Congress has "positively required by direct enactment" that state law be preempted. *Hisquierdo v. Hisquierdo* (1979), 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1, 11 (quoting *Wetmore v. Markoe* (1904), 196 U.S. 68, 77, 25 S.Ct 172, 176, 49 L.Ed. 390, 394). A mere conflict in words is not sufficient; the state law must do "major damage to clear and substantial federal interests." 439 U.S. at 581, 99 S.Ct. at 808, 59 L.Ed.2d at 11 (quoting *United States v.*

*Yazell* (1966), 382 U.S. 341, 352, 86 S.Ct. 500, 507, 15 L.Ed.2d 404, 410).

*Hisquierdo* arose from a wife's claim of a community property interest in her husband's federal railroad retirement benefits. The Court held that the Railroad Retirement Act preempted California community property law to the extent that California law provided that retirement benefits under the act were community property. The act in question made detailed provisions for the employee's spouse entitling the spouse to an individual benefit if the spouse lived with the employee and received regular contributions from the employee for support, or was entitled to support from the employee pursuant to court order. 439 U.S. at 575, 99 S.Ct. at 805, 59 L.Ed.2d at 7 (citing 45 U.S.C. § 231a(c)(3)(i)). However, the act terminated those benefits upon divorce of the spouse and the employee. *Id.* (citing 45 U.S.C. § 231d(c)(3)). In addition, 45 U.S.C. 231m provided:

"Notwithstanding any other law of the United States, or of any state, territory or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall payment thereof be anticipated...."

439 U.S. at 575, 99 S.Ct. at 805, 59 L.Ed.2d at 7 (quoting 45 U.S.C. § 231m). The Court reasoned that Congress had fixed an amount it thought appropriate to support an employee's old age and to encourage early retirement, and that § 231m protected Congress's deliberate choice by ensuring that those benefits actually reached the employee. Any automatic diminution in the amount fixed by Congress would frustrate the objectives of the statutory scheme. 439 U.S. at 585, 99 S.Ct. at 810, 59 L.Ed.2d at 13.

The Court refuted the wife's argument that 231m did no more than restate the government's immunity from garnishment suits and that it would be acceptable for the trial court to maintain jurisdiction and order the husband to pay as he received the benefits. The Court noted the "settled

view" that anti-assignment statutes have substantive meaning and reasoned that § 231m went far beyond garnishment to state that the employee's annuity was not subject to any "legal process under any circumstances whatsoever," nor was payment subject to anticipation. 439 U.S. at 586, 99 S.Ct. at 811, 59 L.Ed.2d at 14. The Court reasoned that to accept the wife's solution would be to mechanically deprive the husband of a portion of the benefit that Congress had carefully allocated to him alone. 439 U.S. at 583, 99 S.Ct. at 809, 59 L.Ed.2d at 12. Finally, the Court rejected the wife's claim that the trial court could vindicate her community property interest and leave the statutory scheme intact by offsetting the husband's retirement benefits with an award from existing community property. It reasoned that such an award would violate the § 231m prohibition against anticipation of the husband's receipt of benefits and could upset the statutory scheme to an even greater extent than payment of benefits as they were received because the husband might not receive benefits sufficient to offset the award due to various contingencies including death. 439 U.S. at 589, 99 S.Ct. at 812, 59 L.Ed.2d at 15.

In *McCarty v. McCarty* (1981), 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 the Supreme Court again held that California community property law was preempted by a federal statute. *McCarty* involved a wife's community property claim to her husband's military retirement benefits. Upon reviewing the statute as a whole, the Court determined that Congress intended for the husband's retired pay to be his sole property. The Court concluded that both the structure of the statute and the legislative history indicated that Congress had intended for the retirement pay to actually reach the beneficiary. In addition, the Court addressed the question of whether the consequences of applying California's community property law sufficiently injured the objectives of the federal statute. The justices discerned two major functions of the legislation: to provide for the retired service member and to serve as a personnel management tool. The Court found that California's community property law of-

fended both objectives, however it emphasized the importance of the retirement scheme as a personnel management tool to encourage early retirement and ensure a younger, more vigorous military.

Here, Husband claims that 5 U.S.C. § 8130 preempts Indiana law to the extent that Indiana allows the division of his OWCP benefits pursuant to a dissolution decree. That section provides:

"An assignment of a claim for compensation under this subchapter is void. Compensation and claims for compensation are exempt from claims of creditors."

According to Husband, the trial court's award of 50% of his OWCP benefits to Wife transformed Wife into a creditor creating a conflict between I.C. § 31–1–11.5–2(d) and § 8130 to the extent that the former allows division of OWCP benefits.

The case of *Anthony v. Anthony* (1981), Tex.App., 624 S.W.2d 388 is on point. In *Anthony*, the trial court had divided an amount of the husband's OWCP equal to the amount of Civil Service Disability benefits (OPM) the husband waived in order to receive the OWCP benefits. *Id.* at 389. He claimed that federal law preempted Texas domestic relations law to the extent that Texas law allowed division of any portion of his OWCP benefits, relying upon *Hisquierdo* and *Wissner v. Wissner* (1950), 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424. The *Anthony* court first noted that, by the *express* terms of 5 U.S.C. §§ 8346(a) and 8345(j)(1), Civil Service Retirement benefits were divisible in divorce actions. 624 S.W.2d at 390. The husband, however, contended that he had transformed his former disability benefits into separate property through his election to receive OWCP benefits. The court rejected that contention.

In reaching its decision, the *Anthony* court examined 5 U.S.C. § 8130 and concluded that the statute did not evince a Congressional intent to remove OWCP benefits from the normal operation of state family law. 624 S.W.2d at 391. The court reasoned that, although § 8130 does render void an assignment of a claim, the division of a property right by a court is not an

assignment. The wife could not be considered a creditor. *Id.* The court explained that, if Congress had intended to exempt the proceeds from court process, it would have used language similar to the language in the Railroad Retirement Act (or in 38 U.S.C. § 3101(a), which is similar to the language used in the Railroad Retirement Act). The court distinguished *Hisquierdo* and *Wissner* on those grounds. Furthermore, the *Anthony* court found nothing in *McCarty* requiring a finding of preemption, although the court did not explain why *McCarty* was distinguishable from the case before it. *Id.*

Although we are not bound by *Anthony*, it is persuasive authority. *Hisquierdo* and *McCarty* state that Congress must clearly express its intent to displace state domestic relations law. The result in *Hisquierdo* is distinguishable because the Court relied upon 45 U.S.C. § 231m, which specifically protects the retiree's annuity from "legal process" "notwithstanding any other law ... of any State." In this case, 5 U.S.C. § 8130 simply renders void the assignment of a claim and provides that compensation is exempt from claims of creditors. Because of the presumption that state domestic relations law is unaffected by federal law, we should not read such language to prohibit a state court from exercising its power to divide marital assets pursuant to dissolution proceedings.

*McCarty* also differs from the case before us, although the distinction is not as evident because *McCarty* does not base preemption upon clear language such as that found in § 231m. Rather, the *McCarty* Court found preemption based upon the structure and policy of the military retirement statutes. The primary distinction is in the degree of frustration of Congressional purpose. While the Congressional objective of allocating the proper amount to provide for the future of the employee that was present in *McCarty* is also present here, the personnel management objective upon which *McCarty* elaborated in great detail is not apparent in the workers' compensation statute.

Husband seeks to distinguish *Anthony* on grounds that Texas law provides for alimony whereas Indiana law does not, and that a spouse seeking enforcement of an alimony award may do so through the vehicle of contempt whereas a spouse seeking enforcement of a property award is a general creditor. According to Husband, § 8130 exempts OWCP compensation from property division because it exempts such compensation from claims of creditors.

We are not persuaded by Husband's argument for two reasons. First, we are immediately concerned with the trial court's ability to divide the OWCP benefits as a marital asset, and the trial court certainly is not a "creditor." Second, the issue is whether Congress has preempted state domestic relations law to the extent that state law allows the division of OWCP benefits. It would contravene the logic of preemption doctrine to allow division in some states (community property or alimony states) because of the method by which those states provide for what is essentially property division while preempting division in other states.

Husband also attempts to distinguish *Anthony* on the basis that the trial court in that case only divided OWCP benefits representing the equivalent of the OPM benefits waived by the Husband under 5 U.S.C. § 8116(b). Therefore, according to Husband, the only issue before the court was whether that particular amount was community property. In reaching its decision, however, the *Anthony* court interpreted § 8130 which applied to all OWCP benefits and concluded that Congress had not preempted state domestic relations law. While the court recognized that 5 U.S.C. §§ 8346(a) and 8345(j)(1) expressly allowed division of OPM benefits, it did not rely upon those sections in interpreting § 8130.

Husband also relies upon *Mansell v. Mansell* (1989) 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675. That case interpreted the federal Uniformed Services Former Spouses' Protection Act (10 U.S.C. § 1408) passed by Congress in response to *McCarty*. The *Mansell* Court held that, although the language of the act allowed courts to

**1174** 

treat "disposable retired or retainer pay" as community property, such pay was defined to exclude amounts waived by the retiree in order to receive disability benefits. 490 U.S. at 589, 109 S.Ct. at 2028, 104 L.Ed.2d at 685. The Act therefore only partially overruled *McCarty*. *Mansell* does not govern this case because the Court interpreted specific statutory language which is not applicable to OWCP benefits and which is not similar to any language contained in the statute before this court.

 We now turn to Husband's claims regarding the trial court's calculation of child support payments. First, Husband contends that the trial court erred by not attributing any income to Wife from the kennel business.[3] Husband essentially claims that the trial court's finding that the kennel business was not generating a positive cash flow is unsupported by evidence in the record. Husband points to Wife's exhibit J which showed the kennel's net operating profit to be $2,039.41 for the previous five months. We agree that the trial court erred in this instance.

Indiana Child Support Guideline 3, which defines income to be be attributed to a parent states:

"Weekly Gross Income from self-employment, operation of a business, rent and royalties is defined as gross receipts minus ordinary and necessary expenses. Specifically excluded from ordinary and necessary expenses for purposes of these Guidelines are depreciation, investment tax credits, or any other business expense determined by the Court to be inappropriate for determining weekly gross income for purposes of calculating child support. In general, these types of income and expenses from self-employment or operation of a business should be carefully reviewed. In most cases, this amount will differ from a determination of business income for tax purposes.

Expense reimbursements or in-kind payments received by a parent in the course of employment, self-employment,

or operation of a business should be counted as income if they are significant and reduce personal living expenses...."

Wife did testify that the kennel only made $113.00 for the year, but that calculation included depreciation losses and expenses such as utilities and mortgage payments on the marital residence. The guidelines specifically exclude depreciation from the calculation of ordinary and necessary expenses, and they strongly suggest consideration of the kennel's contributions to the mortgage and utility payments of the custodial residence. Wife's exhibit J shows a net operating profit of $2039.41 for the period between May 1989 and May 1990 when the above-mentioned factors are considered. Therefore, under the guidelines and the comments thereto, the trial court erred by not attributing to wife any weekly income from the kennel. Given the structure of the guidelines, the omission of such income necessarily affects the support calculation.

 Wife contends that it was within the trial court's discretion not to award the presumptive amount under the guidelines. While we agree with that general proposition, we hold that the trial court abused its discretion in this instance.

The Indiana Supreme Court adopted the guidelines for use in all child support determinations made after October 1, 1989. Support awards determined by application of the guidelines are presumptively correct. Child Support Rule 2; *Gielsdorf-Aliah v. Aliah* (1990), Ind.App., 560 N.E.2d 1275, 1276. The parent who seeks deviation from the guideline support calculation must present evidence rebutting the presumptive amount as unjust or inappropriate under the circumstances. 560 N.E.2d at 1275. A trial court may, in its discretion, deviate from the presumptive amount specified by the guidelines if application would result in an unjust award. Child Supp.R. 3; *Carter by Carter v. Morrow* (1990), Ind.App., 563 N.E.2d 183, 185. We will affirm the trial court's order unless it

---

**3.** As in issue III, Wife claims that Husband has failed to properly frame this issue on review.

However, we again find that Husband has sufficiently raised this issue for review.

is "clearly erroneous." *Humphrey v. Woods* (1991), Ind., 583 N.E.2d 133. However, when the trial court deviates from the presumptive amount, it must "enter a written finding articulating the factual circumstances supporting that conclusion." *Carter*, 563 N.E.2d at 185; Ind. Child Supp.R. 3. Here, the trial court departed from the guidelines in calculating Wife's income, but it did not specify a reason for doing so. The trial court's findings are therefore clearly erroneous because the court did not provide sufficient reasons for the exercise of its discretion to depart from the presumptive amount. *See In re Marriage of Miles* (1977), 173 Ind.App. 5, 9, 362 N.E.2d 171, 174 (when applying standard of review of special findings to case where the outcome rests within discretion of the trial court, an appellate court will reverse if the reasons given are insufficient as a matter of law to justify the manner in which the trial court exercised its discretion).

■ Husband also claims that the trial court erred by attributing to him an income of $817 per week for purposes of calculating child support even though the court had awarded Wife ½ of Husband's sole income source (his OWCP benefits) while not attributing any income to Wife. Wife confesses error here, but claims that we may correct the error on appeal by simply recalculating the amount of child support owed by Husband. We decline to do so, and on remand, we direct the trial court to account for the division of Husband's OWCP benefits as well as Wife's income from the kennel in determining its support award.

■ Husband next contests the trial court's failure to modify the provisional order it had issued pursuant to I.C. § 31–1–11.5–7. Husband has not raised an appealable issue. Failure to timely appeal from an interlocutory order authorized by Ind. Appellate Rule 4(B) that does not require certification results in waiver of that issue. *Parkison v. TLC Lines, Inc.* (1987), Ind. App., 506 N.E.2d 1105, 1108; *Bowyer v. Vollmar* (1987), Ind.App., 505 N.E.2d 162, 166–67; *See also Whitlock v. Public Service Company of Indiana, Inc.* (1959), 239 Ind. 680, 159 N.E.2d 280, 283. Ind. Appellate Rule 4(B) lists 5 categories of interlocutory orders appealable without certification, the first of which provides for appeal of interlocutory orders "For the payment of money...." In *Castor v. Castor* (1975), 165 Ind.App. 520, 333 N.E.2d 124, the court held that a trial court's order for temporary support and attorney fees under I.C. §§ 31–1–11.5–7 and 31–1–11.5–16 (as they then existed) constituted an order "for the payment of money" under App.R. 4(B)(1). 165 Ind.App. at 523, 333 N.E.2d at 126. Here, the trial court's denial of Husband's petition for modification, as well as the original provisional order, were orders that were appealable under App.R. 4(B)(1), and Husband waived any alleged error by failing to pursue a timely appeal.

■ Finally, Husband claims that the trial court erred in awarding Wife one-half of the lump sum payment he was to receive for the retroactive OWCP benefits to which he was entitled. Husband contends that there was no evidence from which the trial court could have ascertained the amount of the lump sum payment, and that the lack of such evidence renders the asset too uncertain to divide. We conclude that the trial court's finding was supported by evidence in the record.

Husband requested special findings in this case. We afford special findings a two-tier standard of review. First, we determine if the evidence supports the findings, and second, we determine if the findings support the judgment. If we conclude that the findings support the judgment and are not clearly erroneous, we will affirm the judgment. A judgment is clearly erroneous when a review of the record leaves us with a definite and firm conviction that a mistake has been made. *DeKalb County Eastern Community School District v. DeKalb County Eastern Education Association* (1987), Ind.App., 513 N.E.2d 189.

On cross-examination, Husband testified that he would receive a lump sum payment for the difference between the amount he was eligible for under OWCP and the amount he received from OPM. Although Husband testified that he had not been

notified as to what that amount would be, his testimony provided the court with information from which it could calculate the amount. Husband testified that he expected to receive his first OWCP payment in June, 1990. Even though neither party has pointed us to any evidence regarding the amount Husband actually received from OPM, which would affect the amount of the retroactive payment he was entitled to from OWCP, the evidence is specific enough to support an award by the trial court. Husband has not raised the issue of whether the trial court's calculation was erroneous, so we need not consider that question.

In conclusion, we reverse and remand to the trial court for reconsideration of the amount of child support owed by Husband and affirm the judgment of the trial court in all other regards.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

SULLIVAN and BAKER, JJ., concur.