617 So.2d 1373 (1993)
Phil D. HARMON, Plaintiff-Appellant,
v.
Sandra N. HARMON, Defendant-Appellee.
No. 92-841.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1993.
*1374 David L. Wallace, DeRidder, for plaintiff-appellant.
Vernon Bruce Clark, Leesville, for defendant-appellee.
Before DOUCET, YELVERTON and COOKS, JJ.
YELVERTON, Judge.
This is an appeal from a partition of community property. The trial court ruled that fire insurance proceeds, from the destruction of the marital home, and portions of the husband's military retirement pay were assets of the former community. The husband appeals these rulings. We affirm.

FACTS
Phil Harmon, plaintiff, and Sandra Louise Nevil Harmon, defendant, married on August 26, 1973. The couple acquired a *1375 community property home in Slagle, Louisiana. The marital home was subject to a mortgage which required the parties to maintain fire and hazard insurance on the property. The payment schedule was typical of most mortgages in that it required the Harmons to pay their insurance premiums together with their mortgage payments in one lump sum to an escrow agent. The mortgage company would then pay the insurer from the escrow account.
Initially, the Harmons chose to insure their home through the Insurance Company of North America (INA). The INA policy listed both Sandra and Phil as named insureds.
Phil testified that INA cancelled the Harmon's policy in June 1986, and that he immediately obtained a new policy from the Hartford Insurance Company. The Hartford policy lists only Phil as the named insured.
In September 1986, Phil filed for divorce. A divorce was granted in February 1987. In July 1989, a fire destroyed the marital home and most of its contents. Pursuant to the Harmon's fire and hazard policy, Hartford satisfied all encumbrances that existed on the Harmon's marital home. Afterwards, some $50,000 remained in insurance proceeds. Hartford deposited these residuary proceeds into the registry of the court.
The parties stipulate that Phil made all of the mortgage payments (and thus, all insurance premium payments) on the Hartford policy until the time of loss. Phil claimed that the proceeds were his separate property. The trial court disagreed and ruled that the proceeds were an asset of the former community. It therefore awarded the proceeds to both parties in equal portions subject to Phil's right to reimbursement for his payment of various community debts. Phil appeals.
In a separate assignment of error Phil complains that the trial court erred in awarding Sandra any proceeds from his military retirement pay that he is receiving after a career in the U.S. Army. We will address each assignment separately.

INSURANCE PROCEEDS
Phil claims that the trial court erred in awarding Sandra any of the insurance proceeds, arguing that she was not a named insured under the Hartford policy. In Hartford Ins. Co. of Southeast v. Stablier, 476 So.2d 464, 466 (La.App. 1st Cir. 1985), the First Circuit analyzed this very same issue as follows:
A manner of establishing an insurance contract was entered into for the benefit of one other than the named insured is to show the named insured was acting as a negotiorum gestor. See La.Civ.Code art. 2295. The burden of proof in this instance is upon those who are not the named insured. Franks [] [v. Harper, 141 So.2d 690 (La.App. 3d Cir.1962)]. See also, Voorhies v. Lomenick, 228 So.2d 509 (La.App. 3d Cir.1969). They must establish the named insured intended to cover an interest other than her own insurable interest.
Thus, for Phil to prevail, we must find that Sandra had the burden of proof to establish that Phil acted in her interest when he insured the marital home, and that she did not prove he acted in her interest.
The trial court questioned Phil directly about his intentions when he purchased the policy:
Q. Just a minute, Mr. Harmon, let me ask you specific questions. When you purchased the insurance to cover this house, once again, you named yourself as obviously the sole insured on the property?
A. Yes sir.
Q. You did not do that as an agent for your wifeex-wife or in any capacity as per her instructions, did you, sir?
A. I was under a court order not to go around her, sir, at that time. I couldn't get any assistance from her at all and when I attempted to call her she hung up on me.
Q. So, the answer to the question is no?
A. That's correct, the answer is no.
In addition to the above testimony, Phil bolsters his argument by relying on the holding in Stablier. In that case, four *1376 sisters owned a house in indivision. One sister, Mrs. Stablier, wished to insure the house. She approached the other three sisters about paying their proportionate share of the premiums; however, all three eventually refused to participate. Thereafter, Mrs. Stablier took out a policy for the value of the entire property listing only herself as the named insured. She paid all of the premiums herself. When the house was destroyed, the court held that Mrs. Stablier displayed no intention to act on behalf of her sisters when she insured the property. Hence, the court awarded all of the proceeds to Mrs. Stablier.
Phil's reliance on Stablier is flawed in two ways: (1) Phil ignores the fact that he acquired the Hartford policy during the existence of his and Sandra's community property regime, and (2) he fails to consider the effects of co-ownership after the community property regime's termination.

A. Community Property
Phil took out the Hartford policy in June of 1986. The Harmon's regime of acquets and gains ended when Phil filed for divorce on September 2, 1986. La.C.C. art. 159. Hence, Phil contracted with Hartford while the community property regime was still in existence.
"An obligation incurred by a spouse during the existence of a community property regime for the common interest of [both]... spouses ... is a community obligation." La.C.C. art. 2360. Since fire insurance was a necessary condition of the mortgage, and since Phil and Sandra each owned an undivided one-half interest in the community home (La.C.C. art. 2336), INA's cancellation of the Harmon's fire and hazard policy necessarily threatened both Phil's and Sandra's interests. In other words, without fire insurance, both Phil and Sandra, as members of the community, risked both foreclosure and fire and hazard loss. Therefore, when Phil replaced the INA policy with the Hartford policy, he was acting in the interest of both spouses. In Stablier, the co-owners were four sisters whose co-ownership was never subject to a community property regime. Therefore, as far as those escrow payments that Phil made during the existence of the Harmon's community are concerned, the Stablier holding is distinguishable.

B. Co-Ownership
After termination of the community property regime, the provisions governing co-ownership apply unless there is a contrary provision of law. La.C.C. art. 2369.1. (We note that La.C.C. art. 2369.1 was enacted subsequent to the present action; however, we find that Article 2369.1 is a mere codification of jurisprudence which existed long before the present action and therefore applicable to the case before us. See La.C.C. art. 2369 Revision Comments 1979(c) ["A spouse having control of community property at the termination of the community property regime occupies the position of a co-owner under the general law of property."]; see Spaht, Matrimonial Regimes, 51 La.L.R. 321, 325 (1990)). Hence, when the Harmon's community regime terminated on September 2, 1986, Phil and Sandra owned the former marital home as co-owners in indivision.
After the community's termination, Phil continued to make the escrow payments just as he had always done. Unlike Mrs. Stablier, Phil never contacted Sandra, his co-owner, and requested that she participate in making the escrow payments. It is true that Phil testified that he was unable to go near Sandra because of a restraining order; however, we fail to see how this restraining order prevented Phil from giving Sandra, or her attorney, notice that his actions were for the benefit of only his interest in the property and not for that of Sandra's. Had he done so, he would be in a better position to rely on Stablier. However, he did not do so. Thus it was logical for Sandra to assume that Phil was simply servicing a former community debt in the interest of both parties. Therefore, we find that the trial court did not err in finding the insurance proceeds to be an asset of the former community.
La.C.C. art. 806 provides that a "co-owner who on account of the thing held in indivision has incurred necessary expenses *1377 ... is entitled to reimbursement from the other co-owners in proportion to their shares." Revision Comment (b), which follows La.C.C. art. 806, directs the reader to La.C.C. art. 2314 (Repealed 1979) for the definition of "necessary expenses". La. C.C. art. 2314 (Repealed 1979) describes necessary expenses as those that are expended for the "preservation" of the property. In interpreting this now repealed article, the Louisiana Supreme Court viewed insurance as a necessary expense for which a co-owner is entitled to reimbursement. Sharp v. Zeller, 114 La. 549, 38 So. 449, 451 (1905).
In the case before us, fire and hazard insurance was a condition of the mortgage. If Phil had not acquired the Hartford policy, he and Sandra would have risked foreclosure as well as fire and hazard loss. Therefore, when Phil continued paying the escrow payments after the community's termination, he was incurring a necessary expense for the preservation of Phil's and Sandra's co-owned property. Accordingly, the trial court was not in error in ordering that Phil be reimbursed for those escrow payments that he made from his separate property. This assignment has no merit.

MILITARY RETIREMENT PAY
Phil was a career serviceman in the U.S. Army. After serving for some 24 years, Phil was honorably discharged due to a physical disability. Upon being discharged, the Army declared Phil eligible for 258 months worth of retirement pay at a rate of $1036 per month.
That portion of a spouse's retirement plan that was earned during the existence of the community regime is community property and is subject to partition at the community's end. Frazier v. Harper, 600 So.2d 59, 61 (La.1992); Hare v. Hodgins, 586 So.2d 118 (La.1991); and Sims v. Sims, 358 So.2d 919 (La.1978).
Because of his disability Phil was eligible for tax-free, veteran's disability benefits. In order to receive those benefits, however, federal law required Phil to waive corresponding amounts of his military retirement pay. See 38 U.S.C.A. § 5305 (West 1988 ed.). Military retirement pay that has been waived to receive veteran's disability benefits is not community property. 10 U.S.C.A. § 1408(a)(4)(B) (West Supp.1992); Mansell v. Mansell, 490 U.S. 581, 595-96, 109 S.Ct. 2023, 2032, 104 L.Ed.2d 675 (1989) (holding that 10 U.S.C.A. § 1408(a)(4)(B), the Former Spouses' Protection Act, does not grant states the power to treat military retirement pay that has been waived to receive veteran's disability benefits as property divisible upon divorce); Wright v. Wright, 594 So.2d 1139, 1142 (La.App. 3d Cir.1992). Hence, Sandra is entitled to her community share in that portion of Phil's retirement pay that was earned during the existence of the community less those amounts that Phil waived to receive disability benefits.
In determining Sandra's interest in the retirement pay, the trial court applied the "fixed percentage" formula that was set out in Sims, 358 So.2d at 924. "Under that formula, the community portion of the pension right is deemed to be the same fraction that results when the length of the employee spouse's creditable employment during the community is divided by the length of his total creditable employment." Hare 586 So.2d at 125; Sims 358 So.2d at 924.
In the case before us, the community existed from August 26, 1973, to September 2, 1986, or about 156 months. Phil was in the Army during that entire time. The Army credited Phil for 258 months worth of retirement pay. Dividing Phil's creditable employment during the community (156 months) by the length of his total creditable employment (258 months), the trial court determined the "community fraction" to be .6047. See Hare 586 So.2d at 124. After deriving the community fraction, the trial court (1) determined the various amounts of retirement pay Phil withheld in order to receive disability benefits, (2) subtracted those amounts from Phil's monthly retirement pay of $1036, (3) multiplied those differences by the community fraction, .6047, (4) divided those products *1378 by two, and (5) multiplied those quotients by the number of months that Phil waived the retirement benefit. These computations appeared in the trial court's Reasons for Judgment as follows:
The evidence herein establishes that, as of May 6, 1989, Mr. Harmon's monthly retired pay was $1,036.00. The evidence further demonstrates that during the period from retirement until December 1, 1989, Mr. Harmon waived $426.00 per month of retirement pay in order to receive a tax-free disability from the Veteran's Administration in that amount. Thus his disposable retired pay would have been the sum of $610.00 per month ($1,036.00 minus $426.00) of which $368.87 ($610.00 × .6047) would have belonged to the community. The wife's interest in the retirement pay received for that period
 $368.87 × 7
 ------------
would have been 2 the sum
of $1,291.04.
From January 1, 1990 through December 1, 1990 Mr. Harmon waived $446.00 per month on account of his disability. Thus his disposable retired pay would have been the sum of $590.00 per month ($1,036.00 minus $446.00) of which $356.77 ($590.00 ×.6047) would have belonged to the community. The wife's interest in the retirement pay received for that period would have been
$356.77 × 12
------------
 2 the sum of $2,140.62.
From January 1, 1991 to June 1, 1991 Mr. Harmon waived $470.00 per month on account of his disability. Thus his disposable retired pay during the period would have been the sum of $566.00 per month ($1,036.00 minus $470.00) of which $342.26 ($566 ×.6047) would have belonged to the community. The wife's interest in the retirement income received for that
 $342.26 × 5
 -----------
period would have been 2
the sum of $855.65.
From June 1, 1991 forward disability was fixed at 100%. Mr. Harmon received disability income in the amount of $1,620.00 and there was, therefore, no disposable retirement income belonging to the community of acquets and gains.
The wife's total interest in the retirement income from retirement until June 1, 1991 is the sum of $4,287.31.
In general, the valuation and division of pension rights are matters for the trial court's discretion. Hare, 586 So.2d at 123. Since the general rules for partitioning community property do not address all of the "problematic ramifications" of distributing each spouse's interest in pension benefits, which were earned partly during the marriage and partly outside of the marriage, a court is "... bound to proceed equitably ... making resort to justice, reason and prevailing usages." Id., citing La. C.C. art. 4.
In the case before us the trial court used the fixed percentage method to partition the retirement pay. The Louisiana Supreme Court has recognized this method as a "prevailing usage" by which retirement benefits may be partitioned. Hare, 586 So.2d at 125; Sims, 358 So.2d at 924. As far as the facts of this case are concerned, we see no inequity nor any abuse of discretion in the trial court's method of partitioning the retirement pay.
Phil argues in his brief that the trial court erred in finding that he waived all of his retirement pay to receive disability benefits effective June 1, 1991. Instead, Phil claims that he waived all of his benefits on July 15, 1990, nearly one year earlier. Accordingly, Phil argues, Sandra is not entitled to any of his retirement benefits beyond July 15, 1990.
The only evidence in the record supporting Phil's claim is his own testimony. A document with a "Department of Veterans Affairs" letterhead and a "VA FORM" identification number 20-8993 appears in the record. This document states in part that Phil's disability compensation award is $1,620 effective June 1, 1991. In making its finding, the trial court apparently chose to accept the information from the VA forms over Phil's testimony. Our review of the record shows that the trial court was not clearly wrong or manifestly erroneous *1379 in finding that Phil's waiver of all of his retirement pay, to receive disability benefits, was effective June 1, 1991. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
For the above reasons, the ruling of the trial court is affirmed.
AFFIRMED.